**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Luis Fernando MOSQUERA–RAMIREZ,
Defendant-Appellant.**

**No. 83–5006.**

United States Court of Appeals,
Eleventh Circuit.

April 16, 1984.

---

Charles G. White, Kenneth E. Cohen, Asst. Federal Public Defenders, Miami, Fla., for defendant-appellant.

Stanley Marcus, U.S. Atty., Linda Collins Hertz, James G. McAdams, James R. Gailey, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before RONEY, HATCHETT and ANDERSON, Circuit Judges.

RONEY, Circuit Judge:

Today we have decided that an x-ray search performed at the border is reasonable if based on the same amount of suspicion required for a strip search. *United States v. Vega-Barvo*, 729 F.2d 1341 (11th Cir.1984). This case presents the issue of whether it violates the Fourth Amendment

to detain a person who refuses a reasonable x-ray search until a bowel movement occurs through natural body functions.

Luis Fernando Mosquera-Ramirez was suspected by customs officials of carrying drugs internally. Because he refused to consent to an x-ray of his stomach, he was detained until he passed his stomach's contents. Eventually, he excreted 95 cocaine-filled condoms. Convicted of importation and possession of cocaine with intent to distribute in violation of 21 U.S.C.A. §§ 952(a) and 841(a)(1), Mosquera-Ramirez disputes the legality of his detention and the subsequent search of his fecal matter. The district court held that the customs inspectors had reasonable suspicion to believe Mosquera-Ramirez was carrying drugs internally and that detaining him until he moved his bowels was a reasonable method of searching his digestive tract. We affirm.

■ A review of the facts reveals that the customs inspectors' suspicions about Mosquera-Ramirez were based on articulably suspicious behavior sufficient to make an x-ray search reasonable. *Vega-Barvo,* 729 F.2d at 1344. As we noted in *Vega-Barvo,* a suspicion may be reasonable even though it rests substantially on the inability to give a credible explanation for a trip to this country.

■ Mosquera-Ramirez arrived at Miami International Airport from Bogota, Colombia shortly after midnight. He presented himself and his luggage for Customs clearance before a customs inspector. While the inspector was examining Mosquera-Ramirez's passport and other papers, he questioned Mosquera-Ramirez about the purposes of his trip. Mosquera-Ramirez explained that although he was on vacation he planned to travel to Los Angeles to shop for electronic equipment. His Customs Declaration had an extensive list of intended purchases including Betamaxes and stereo components. Mosquera-Ramirez also stated he was in the billiards business.

The inspector probed further on the business aspect of Mosquera-Ramirez's trip. He inquired as to why Mosquera-Ramirez did not have a airline ticket to Los Angeles, what his Los Angeles itinerary was, what price he expected to pay for the listed electronic items, and what stores in Los Angeles he was going to visit. Although Mosquera-Ramirez said he planned to buy a ticket to Los Angeles in Miami, he could not answer the other questions. Subsequent inquiries revealed that Mosquera-Ramirez was carrying $1,295 in cash but had no credit cards, checks, or letters of credit.

At this point, the inspector decided that a more thorough inspection was necessary and he asked Mosquera-Ramirez to step into a search room. In the search room, the inspector more closely examined Mosquera-Ramirez's passport. He noticed that Mosquera-Ramirez had traveled to Miami just two months ago. When asked about the previous trip, Mosquera-Ramirez became very evasive and very nervous.

The inspector then requestioned Mosquera-Ramirez on his purported buying trip. Mosquera-Ramirez said he was going to spend a week to ten days at the Clark Hotel in Los Angeles, so the inspector calculated on paper what airfare, lodging, meals, and cab fare would cost for a week-long excursion to Los Angeles. When confronted with the fact that such a trip would exhaust most of his capital, Mosquera-Ramirez was unable to explain how he planned to buy electronic equipment in Los Angeles as well. Mosquera-Ramirez also could not give a definite itinerary for his stay in Miami. The most he could say was that he was there to rest.

On the basis of his experience, the inspector concluded that Mosquera-Ramirez was carrying drugs internally. He informed Mosquera-Ramirez of his suspicions, advised him of the *Miranda* Rights, and asked him if he would submit to an x-ray examination. Mosquera-Ramirez refused, replying that if he was going to be treated so inhospitably he wanted to return to Colombia. This further heightened the

inspector's suspicion that Mosquera-Ramirez was an internal carrier.

Questioning of Mosquera-Ramirez was then turned over to a Drug Enforcement Administration (DEA) agent. The agent received the same inconclusive answers as had the customs inspector. Mosquera-Ramirez did admit, however, that he was not in the billiards business but just worked at a billiards hall.

On these facts, the reasonable suspicion standard for x-ray searches was met. Mosquera-Ramirez's weak story about buying Betamaxes and stereo components and his initial exaggeration of his employment constituted articulably suspicious behavior. If the cocaine Mosquera-Ramirez was carrying had been located by an x-ray search, he could not complain.

Mosquera-Ramirez, however, refused both the custom inspector's and the DEA agent's request to consent to an x-ray examination. Unwilling to release a suspected carrier, the DEA agent took Mosquera-Ramirez to a local hospital for the purpose of detaining him until he discharged the contents of his stomach. At the hospital, Mosquera-Ramirez was directed to remove his clothes and put on a hospital gown. Just over twelve hours after he arrived from Colombia, Mosquera-Ramirez began excreting cocaine-filled condoms, 95 in all. He was then placed under arrest.

Mosquera-Ramirez argues that the length of the detention made the discovery of the contraband unconstitutional. Clearly, even if some detention is constitutionally reasonable under a given set of circumstances, the length of that detention can make the detention an unreasonable seizure, and therefore unconstitutional.

Mosquera-Ramirez relies on *United States v. Place*, — U.S. —, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), and *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). In *Dunaway*, police officers took a murder suspect into custody and interrogated him without probable cause. Analogizing this procedure to an illegal arrest, the Court ruled that the confession obtained by these tactics came within the exclusionary rule of the Fourth Amendment. In *Place*, a domestic air traveler's luggage was seized and 90 minutes later tested by a narcotic-detecting dog. The search was held invalid. The Court noted that the initial seizure was a valid *Terry [v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889]-type stop, but ruled inadmissible the cocaine discovered in a later search of the luggage because the 90-minute detention "exceeded the permissible limits of a *Terry*-type investigative stop." — U.S. at —, 103 S.Ct. at 2645, 77 L.Ed.2d at 122.

Both *Dunaway* and *Place*, however, are distinguishable from the instant case. Other courts have rejected *Dunaway* as applicable to detention at the border. *United States v. Ek*, 676 F.2d 379, 381 (9th Cir. 1982); *United States v. Erwin*, 625 F.2d 838, 841 (9th Cir.1980). *Dunaway* involved the Fourth Amendment's probable cause requirement and that traditional standard cannot be easily analogized to the flexible reasonable suspicion standard used at the border. *Dunaway* is also not a *length* of detention case. What concerned the Supreme Court in *Dunaway* was that a person was seized and taken into custody on less than probable cause. Mosquera-Ramirez does not, and could not, contest his initial seizure by the customs inspectors. He claims that at some point this initially valid seizure became unconstitutional because it continued for too long. Thus even if *Dunaway* was applicable to the border situation, it is not on point in the present circumstances.

 *Place* as opposed to *Dunaway*, is a length of detention case. *Place* is also similar to the present case since *Terry*-type investigative stops like border searches are justified by a balancing test which allows law enforcement personnel to act on less than probable cause. But there the similarity ends. Factors far different from those in the border context went into the balancing process which produced the *Terry*-type stop. *Terry*-type investigative stops are the result of a balance between governmental interests in law enforcement

and the individual's Fourth Amendment right to be free from unreasonable searches and seizures. It is only when law enforcement interests are particularly strong and the proposed contact between police and citizen is of a limited nature, that the Court has allowed *Terry* -type stops on less than probable cause. *Place* —— U.S. at ——, 103 S.Ct. at 2642, 77 L.Ed.2d at 118. *See, e.g., Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981); *United States v. Brignoni—Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). Of course, a necessary condition of such stops is that they be short, lasting only long enough to get the kind of information a *Terry* -type stop will reveal. *Place*, —— U.S. at ——, 103 S.Ct. at 2642, 77 L.Ed.2d at 119; *Terry*, 392 U.S. at 29, 88 S.Ct. at 1884. Once a *Terry* stop exceeds its carefully circumscribed limits, the police must observe the probable cause requirement. *Place*, —— U.S. at ——, 103 S.Ct. at 2645, 77 L.Ed.2d at 122.

 Border searches exist in an entirely different context than *Terry* -type stops. Of primary significance is that at the border, searches are not subject to the probable cause and warrant requirements of the Fourth Amendment. *United States v. Ramsey*, 431 U.S. 606, 619, 97 S.Ct. 1972, 1980, 52 L.Ed.2d 617 (1977). The governmental interest and the individual's expectation of privacy are also different than those involved in the normal domestic *Terry* -type stop. As this Court has stated: "[t]he national interests in self-protection and protection of tariff revenue authorize a requirement that persons crossing the border identify themselves and their belongings as entitled to enter and be subject to search." *United States v. Himmelwright*, 551 F.2d 991, 994 (5th Cir.), *cert. denied,* 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977) (quoting *United States v. Brennan*, 538 F.2d 711, 715 (5th Cir.1976), *cert. denied,* 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538 (1977)). These different circumstances have produced a different result in the Fourth Amendment balancing process. *Cf. Terry*, 392 U.S. at 27, 88 S.Ct. at 1883. At the border, a person may be detained long enough for the officials to determine they are entitled to enter the United States. As was stated in *King v. United States*, 258 F.2d 754, 756 (5th Cir. 1958):

> Appellant ignores entirely the well settled principle that detention and search are of the very essence of the enforcement of the laws governing entry of persons into this country and of the detention and the punishment of smuggling.

If the officials must determine that persons entitled to entry are not carrying contraband, they must be given time to make that determination using reasonable search methods. Consideration of the reasonableness of the length of detention must focus on the purpose of detention in the first place. It would not seem unreasonable for government officials to detain a person for the period of time necessary to conduct a valid search. Under the circumstances, detentions long enough to conduct an x-ray would be reasonable.

The customs inspectors seized and detained Mosquera-Ramirez on the basis of enough suspicion to justify a search of the contents of his stomach and intestinal tract. Mosquera-Ramirez was then given the option of submitting to an x-ray, a relatively expeditious search method. He refused. The only way to restrict detention time at that point would have been to physically force an x-ray. The alternative, which the customs officials chose, was to hold the defendant until nature revealed what an x-ray would have shown. The defendant's refusal to agree to submit to an x-ray, which the agents could constitutionally perform, cannot convert the reasonable alternative search method of detention into a Fourth Amendment violation.

In a similar context, the Ninth Circuit has approved detentions lasting as long as twelve hours. *United States v. Couch*, 688 F.2d 599, 602–04 (9th Cir.1982); *United States v. Ek*, 676 F.2d 379, 381 (9th Cir. 1982). That Circuit requires a warrant issued by a judicial officer before an x-ray or body cavity search can be performed on a

person suspected of internally carrying drugs across the border. Apparently these warrants can be issued on less than probable cause. They sometimes result in lengthy detentions. Challenges to such detentions have been rejected, however, on the basis of the principle that if the search is valid, the detention for the length of time necessary to make the search, is also valid.

■ The detention of persons at the border long enough to reveal by natural processes that which would be disclosed by a more expeditious x-ray search cannot be held to be an unreasonable seizure. Nor can the search of the results of that natural process be held to be an unreasonable search.

AFFIRMED.

HATCHETT, Circuit Judge, dissenting:

I dissent for the reasons stated in *United States v. Vega-Barvo*, 729 F.2d 1341 (11th Cir.1984).