**UNITED STATES of America, Appellee,**

v.

**Maria REYES and Griselle Lundorno Santiago, Defendants-Appellants.**

Nos. 281, 394, Dockets 86–1289, 86–1290.

United States Court of Appeals, Second Circuit.

Argued Nov. 18, 1986.

Decided June 24, 1987.

Joel M. Stein, New York City, for defendant-appellant Reyes.

Phylis Skloot Bamberger, The Legal Aid Society, Federal Defender Services Unit, New York City, for defendant-appellant Santiago.

Gregory J. O'Connell, Asst. U.S. Atty., E.D. of N.Y., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., and Matthew E. Fish-bein, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for appellee.

Before LUMBARD, VAN GRAAFEILAND and PIERCE, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

On December 17, 1985, Maria Reyes and Griselle Santiago, New York residents, arrived together at New York's John F. Kennedy International Airport on a flight which originated in Colombia. When they were found to have a total of 143 sausage-shaped balloons filled with cocaine secreted in their alimentary canals, they were arrested and charged with importing and possessing the drugs. They now seek reversal of their convictions, which followed guilty pleas in the United States District Court for the Eastern District of New York, on the ground that x-ray confirmation of the drug's presence in their bodies violated their constitutional rights. Finding no merit in this contention, we affirm.

There was nothing unusual about appellants' attempt to smuggle Colombian drugs into the United States. Anyone at all familiar with what Chief Justice Rehnquist has termed "the veritable national crisis in law enforcement caused by smuggling of illicit narcotics", *United States v. Montoya de Hernandez*, 473 U.S. 531, 538, 105 S.Ct. 3304, 3309, 87 L.Ed.2d 381 (1985), knows that Colombia is one of the principal sources of such narcotics. Customs inspectors have so testified. *United States v. Olcott*, 568 F.2d 1173, 1174 (5th Cir.1978). In case after case, the courts have expressed their agreement. We have described Colombia as "a well-known, perhaps the prime, source of narcotics for the narcotics trade in the western hemisphere." *United States v. Sanders*, 663 F.2d 1, 2 (2d Cir.1981). Other courts have termed it a "frequent source of illegal drugs", *United States v. Barger*, 574 F.2d 1283, 1286 (5th Cir.1978), and "a source of contraband and the origin of extensive drug smuggling activity", *United States v. Grayson*, 597 F.2d 1225, 1228 (9th Cir.), *cert. denied*, 444 U.S. 875, 100 S.Ct. 157, 62 L.Ed.2d 102 (1979). Indeed, according to LEXIS, a computer-

ized legal research service which functions by means of key words, as of June 15, 1987, there were 578 published opinions in which "Colombia" appeared with one or more of the following key words, "drugs", "narcotics", "cocaine", "heroin", "opium" and "marijuana".

Moreover, although the ingestion of drug-filled balloons and condoms is extremely dangerous, *United States v. Oyekan*, 786 F.2d 832, 839–40 (8th Cir.1986), it has become a common smuggling device, particularly among the "very poor and vulnerable". *Id.* n. 14; *see also United States v. Montoya de Hernandez, supra,* 473 U.S. at 538, 105 S.Ct. at 3309. For example, on one day, April 16, 1984, the Eleventh Circuit filed opinions in seven cases in which the defendants had attempted to smuggle Colombian narcotics into the United States in this manner. *United States v. Vega-Barvo,* 729 F.2d 1341 (135 cocaine-filled condoms); *United States v. Mosquera-Ramirez,* 729 F.2d 1352 (95 cocaine-filled condoms); *United States v. Pino,* 729 F.2d 1357 (121 cocaine-filled rubber pellets); *United States v. Castaneda,* 729 F.2d 1360 (husband—131 pellets of cocaine, wife—70 pellets of cocaine); *United States v. Henao-Castano,* 729 F.2d 1364 (85 cocaine-filled condoms); *United States v. Padilla,* 729 F.2d 1367 (115 cocaine-filled condoms); *United States v. De Montoya,* 729 F.2d 1369 (100 cocaine-filled condoms).

Vincent Luongo, the Customs Inspector who interviewed appellants upon their arrival, was no fool. A college graduate with extensive training in Spanish, he had been interrogating Hispanic arrivals at Kennedy Airport practically every day for over two years. When he learned that appellants had been to Pereira, Colombia, a town that, in his words, has a "notorious reputation" as the source of swallowed narcotics, he suspected that appellants might be among the swallowers. Further inquiry strengthened his suspicions. When he asked Reyes why she went to Colombia, she told him that she had gone there on vacation. It is by now well known that a high percentage of individuals discovered in the act of smuggling Colombian narcotics claim to have gone to that Country on vacation,

*United States v. Smith,* 557 F.2d 1206, 1208 n. 1 (5th Cir.1977), *cert. denied,* 434 U.S. 1073, 98 S.Ct. 1259, 55 L.Ed.2d 777 (1978), and the courts have observed that Colombia is a "very unusual" place to go for a vacation, *United States v. Forbicetta,* 484 F.2d 645, 646 (5th Cir.1973), *cert. denied,* 416 U.S. 993, 94 S.Ct. 2404, 40 L.Ed.2d 772 (1974). Inspector Luongo agreed. He testified that Pereira "is not known for its vacation aspects."

Although appellants informed Luongo that they were living together in the Bronx, Santiago explained her trip to Colombia by telling Luongo that she had recently married and went to Colombia to visit her mother-in-law. Luongo then asked Santiago if she was carrying any pictures or photographs of her and her husband "that she would present to her mother-in-law in Colombia" and was told that she didn't have any pictures of her or her husband. Luongo testified that he thought it strange that Santiago "went down to visit her mother-in-law, and could provide no proof to show her mother-in-law as to the marriage." In overruling an objection from Reyes' counsel at the suppression hearing, District Judge Platt expressed his complete agreement with Luongo: "There wouldn't have been a lady in the world that would not have taken pictures down to show the husband's mother." Like the district judge, we believe Luongo's reaction was reasonable and in accord with "common sense and ordinary human experience." *United States v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985).

It is well settled that a reasonable suspicion of illegal concealment may be based, in part, on an "implausible story", *United States v. Montoya de Hernandez, supra,* 473 U.S. at 542, 105 S.Ct. at 3311, an "implausible explanation[ ] of the purpose of [a] trip", *United States v. Oyekan, supra,* 786 F.2d at 838 n. 11, or a story that simply "did not ring true", *United States v. Ramirez-Cifuentes,* 682 F.2d 337, 340 (2d Cir. 1982). *See also United States v. Sanders, supra,* 663 F.2d at 2; *United States v. Aulet,* 618 F.2d 182, 185 n. 1, 188–89 (2d

Cir.1980). We agree with the district court that appellants' stories fell within this area of incredulity.

Other facts uncovered by Luongo made the legitimacy of appellants' expensive round-trips to Colombia even more suspect. Appellants had only limited income from their jobs as clerks. Their plane tickets were purchased only one week before their departure for Colombia, and their passports were obtained only three days before departure, an unusual time schedule for persons planning a vacation trip to a foreign country. Finally, although appellants lived and worked in the Bronx, their tickets were purchased at the same time at a travel agency on Long Island, which reasonably suggests that they were purchased by a third party. The tickets were paid for in cash, thus hiding the identity of the payor, see *United States v. Ogberaha*, 771 F.2d 655, 659 (2d Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 887, 88 L.Ed.2d 922 (1986); *United States v. Sanders, supra*, 663 F.2d at 4; *United States v. Sugrim*, 732 F.2d 25, 31 n. 2 (2d Cir.1984) (Oakes, J., dissenting). Luongo also deemed it significant that the passports were new, because smugglers frequently use new passports to avoid disclosing prior trips to "source" countries.

Appellants take the position that their detention at the border was unlawful because the unusual features of their travel arrangements and itinerary were, in the words of Reyes' appellate brief, "reasonably susceptible of an innocent explanation." We note that appellants, whose only hope of avoiding conviction was by way of the exclusionary rule, did not take advantage of the opportunity presented by the suppression hearing to make that "innocent explanation". Recognizing, as we do, that the burden of proof at the suppression hearing was not on appellants, we nonetheless find no merit in their present argument. "[T]he mere fact that conduct is as consistent with innocence as with guilt does not preclude such conduct from providing the basis for a reasonable suspicion of criminal activity." *United States v. Delos-Rios*, 642 F.2d 42, 45 n. 2 (2d Cir.), *cert. denied*, 451 U.S. 941, 101 S.Ct. 2025, 68 L.Ed.2d 330 (1981); *accord United States*

*v. Vasquez*, 634 F.2d 41, 44 & n. 3 (2d Cir.1980); *United States v. Forero-Rincon*, 626 F.2d 218, 222 (2d Cir.1980). "[T]he requirement of reasonable suspicion is not a requirement of absolute certainty," *New Jersey v. T.L.O.*, 469 U.S. 325, 346, 105 S.Ct. 733, 746, 83 L.Ed.2d 720 (1985), and "[i]t must be rare indeed that an officer observes behavior consistent *only* with guilt and incapable of innocent interpretation," *United States v. Price*, 599 F.2d 494, 502 (2d Cir.1979). Indeed, facts that seem wholly innocent in isolation may, when considered in combination, reasonably alert the suspicions of a trained customs official familiar with the practices of narcotics couriers and their methods of avoiding detection. *United States v. Ramirez-Cifuentes, supra*, 682 F.2d at 342; *United States v. Forero-Rincon, supra*, 626 F.2d at 222.

Bearing in mind our deference to the expertise of trained customs inspectors and the inherent difficulty of detecting alimentary canal smuggling, *United States v. Ogberaha, supra*, 771 F.2d at 658, we agree with the district court that the specific and objective facts articulated by Inspector Luongo justified a substantial suspicion on his part that appellants were attempting to smuggle narcotics into the United States. Luongo did not, however, rush appellants to the x-ray room. Instead, he proceeded from the "less intrusive to the more intrusive", pretty much as we suggested in *United States v. Asbury*, 586 F.2d 973, 976 n. 4 (2d Cir.1978). When a search of appellants' luggage turned up nothing, Luongo obtained authorization from his supervisors to have female agents conduct a pat-down search and then a strip search. Since the internally secreted drugs could not be detected in either search, Luongo was left with the choice of either verifying their presence by x-ray or letting nature take its course and supervising appellants during their periods of defecation. *See United States v. Montoya de Hernandez, supra*, 473 U.S. at 534–35, 105 S.Ct. at 3307–08; *United States v. Pino, supra*, 729 F.2d at 1360. Luongo did not have to make that choice. Appellants gave their written consent to x-rays, which were taken under

appropriate medical supervision at a nearby hospital.

Although the district court found nothing to indicate that the consent was not knowing and voluntary, appellants now contend that they were being unlawfully detained when the consent was given and therefore it was invalid as fruit of the poisonous tree. This contention is without merit. None of the cases cited by appellants involves a border inspection, where detention "beyond the scope of a routine customs search and inspection[ ] is justified at its inception if customs agents, considering all the facts surrounding the traveler and her trip, reasonably suspect that the traveler is smuggling contraband in her alimentary canal." *United States v. Montoya de Hernandez, supra,* 473 U.S. at 541, 105 S.Ct. at 3311; *see United States v. Mosquera-Ramirez, supra,* 729 F.2d at 1355–57. That was the situation in the instant case.

Since we hold that appellants' consent was validly given, we need not reach the question whether consent was necessary. We know, of course, that, in some Circuits, an x-ray examination of alimentary canal smugglers may be conducted without their consent if based upon appropriate reasonable suspicion. *See, e.g., United States v. Mejia,* 720 F.2d 1378, 1381–82 (5th Cir. 1983); *United States v. Saldarriaga-Marin,* 734 F.2d 1425, 1427–28 (11th Cir.1984); *United States v. Vega-Barvo, supra,* 729 F.2d at 1344–49; *United States v. Oyekan, supra,* 786 F.2d at 837. *Contra United States v. Quintero-Castro,* 705 F.2d 1099 (9th Cir.1983). In general, the courts that so hold do so on the basis that x-rays cause less embarrassment, indignity and invasion of privacy than does an ordinary strip search, which may be conducted on appropriate reasonable suspicion alone. *See United States v. Mejia, supra,* 720 F.2d at 1382. Because anything we now say would be only dictum, we will defer ruling on this issue until another day, when the matter is squarely before us.

The judgments of conviction are affirmed.