UNITED STATES of America, Appellee,

v.

**Delaney Abi ODOFIN,
Defendant–Appellant.**

**No. 302, Docket 90–1154.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 1, 1990.

Decided March 22, 1991.

Matthew E. Fishbein, Asst. U.S. Atty. (Andrew J. Maloney, U.S. Atty., Susan Corkery, Andrew M. Luger, Asst. U.S. Attys., E.D.N.Y., Brooklyn, N.Y., of counsel), for appellee.

Colleen P. Cassidy (The Legal Aid Soc., Federal Defender Services Unit, New York City, of counsel), for defendant-appellant.

Before NEWMAN and PRATT, Circuit Judges, and OWEN, District Judge.[*]

OWEN, District Judge:

Delaney Abi Odofin, flying from Nigeria, arrived at J.F.K. International Airport on June 3, 1989 and presented a passport bearing the name "Kerry Roy Woods," which he had fraudulently obtained in 1983. For a number of reasons, see stipulation of facts, infra, the United States Customs Agents at this United States border point of entry had "reasonable suspicion"[1] that at some time before landing Odofin had swallowed balloons or condoms containing narcotic drugs to be thereafter recovered while at large in the United States and the contents sold in the drug market.[2]

---

[*] The Honorable Richard Owen of the District Court for the Southern District of New York, sitting by designation.

1. This "reasonable suspicion" test is embodied in *United States v. Montoya de Hernandez,* 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985), and there is no dispute on this appeal that the facts surrounding Odofin's arrival amply justified the agents' conclusion.

2. This is a common smuggling device at this time, as noted in *Montoya,* 473 U.S. at 539 n. 2, 105 S.Ct. at 3309 n. 2, which catalogues the problem thus: *United States v. DeMontoya,* 729 F.2d 1369 (CA11 1984) (required surgery; swallowed 100 cocaine-filled condoms); *United States v. Pino,* 729 F.2d 1357 (CA11 1984) (required surgery; 120 cocaine-filled pellets); *United States v. Mejia,* 720 F.2d 1378 (CA5 1983) (75 balloons); *United States v. Couch,* 688 F.2d 599, 605 (CA9 1982) (36 capsules); *United States v. Quintero-Castro,* 705 F.2d 1099 (CA9 1983) (120 balloons); *United States v. Saldarriaga-Marin,* 734 F.2d 1425 (CA11 1984); *United States v. Vega-Barvo,* 729 F.2d 1341 (CA11 1984) (135 condoms); *United States v. Mendez-Jimenez,* 709 F.2d 1300 (CA9 1983) (102 balloons); *United States v. Mosquera-Ramirez,* 729 F.2d 1352 (CA11 1984) (95 condoms); *United States v. Castrillon,* 716 F.2d 1279 (CA9 1983) (83 balloons); *United States v. Castaneda-Castaneda,* 729 F.2d 1360 (CA11 1984) (2 smugglers; 201 balloons); *United States v. Caicedo-Guarnizo,* 723 F.2d 1420 (CA9 1984) (85 balloons); *United States v. Henao-Castano,* 729 F.2d 1364 (CA11 1984) (85 condoms); *United States v. Ek,* 676 F.2d 379 (CA9 1982) (30 capsules); *United States v. Padilla,* 729 F.2d 1367 (CA11 1984) (115 condoms);

Since the two normal methods of determining the presence or absence of balloons of narcotics in a person's system are an x-ray or monitoring a bowel movement, the agents accordingly detained Odofin in a continuing border search status until he either consented to an x-ray or had a monitored bowel movement, the latter usually happening within 24 hours. Odofin refused the x-ray and the agents therefore removed him to the Peninsula General Hospital for monitoring the movement and there they patiently waited, expecting, hourly, either a dispelling of their suspicions or, more likely, a confirmation. Odofin was, however, a man of unusual intestinal fortitude. It was not until twenty-four *days* after his arrival at our border that he passed four balloons of heroin.[3] Odofin moved to suppress the evidence on the ground it was the product of an unlawful detention. The government, on the other hand, contended that the length of the detention was under the defendant's own control and he alone was responsible for its duration. The Court below denied the motion and Odofin pleaded guilty to the use of a false passport and entered a conditional plea of guilty to heroin importation, preserving his right to appeal the suppression issue. He was sentenced to consecutive sentences of eighteen months on the heroin count and three months on the false passport count.[4]

We affirm, holding that on the unusual facts of this case and particularly the Customs agents' good-faith conclusion as to the applicability of *United States v. Montoya,* supra, and the judicial oversight that was in fact exercised here, the keeping of Odofin in border search status until Odofin's expected bodily function either dispelled or confirmed the agents' reasonably-held suspicion of narcotics smuggling was not a violation of his Fourth Amendment rights.

Odofin and the government stipulated to the following facts:

On June 3, 1989 Delaney Odofin arrived at John F. Kennedy International Airport from Lagos, Nigeria. He was met at the Customs belt and questioned by United States Customs Inspector Emilio Garibaldi. He appeared nervous and rushed to Inspector Garibaldi, spoke very loudly, and insulted several of the Customs Inspectors.

Based on their experience, Customs Inspectors consider Nigeria to be a "source" country for illegal narcotics. Numerous individuals bringing narcotics into the United States from source countries such as Nigeria carry the narcotics internally by swallowing balloons or condoms containing the narcotics.

Inspector Garibaldi found that Odofin was carrying an American passport # Z4528026 issued in Nigeria in the name of "Kerry Roy Woods". A passport beginning with the letter "Z" indicates an American passport that was lost and replaced overseas. Odofin told Inspector Garibaldi that he was born in Texas, that he was a resident of the United States and that he had been visiting in Nigeria for a month. The travel dates marked on his passport were not consistent with this information. Inspector Garibaldi also noticed that Odofin had a marked Nigerian accent.

Subsequent investigation has revealed that Odofin was born in Nigeria and has been living in Texas for 12 years. Odofin obtained his American passport in 1981 by presenting the birth certificate and college identification of Kerry Roy Woods to the Passport Agency in Houston, Texas. He reported his passport

*United States v. Gomez–Diaz,* 712 F.2d 949 (CA5 1983) (69 balloons); *United States v. D'Allerman,* 712 F.2d 100 (CA5 1983) (80 balloons); *United States v. Contento–Pachon,* 723 F.2d 691 (CA9 1984) (129 balloons). *See also United States v. Reyes,* 821 F.2d 168 (2d Cir.1987).

**3.** On the eighth day of detention, Odofin endeavored to evade the monitoring by getting permission to urinate, but then sitting, using and continuously flushing the toilet and assaulting a government inspector all at the same time. Neither absolution nor confirmation came of this, merely an increased belief on the part of the customs officials that they were right.

**4.** Odofin also appeals the consecutive sentence imposed on the false passport count, discussed infra.

lost after British Immigration officials seized it, and he received a replacement passport in the name of Kerry Roy Woods in September, 1983. The true Kerry Roy Woods has been located in Houston, Texas and his identity has been corroborated by his brother, Darryl Wayne Woods. Kerry Woods stated that he has never knowingly loaned his identification to anyone and that he does not know Delaney Odofin.

During the Customs examination of June 3, 1989, Odofin told Inspector Garibaldi that he had been visiting his sick mother in Nigeria. He could not, however, specify the nature of his mother's illness. He then stated that he had been in Nigeria to set up a consulting business. He was also unable to offer specific information about that business.

Odofin told Inspector Garibaldi that he was an accountant for a Wall Street brokerage firm. When questioned further, however, Odofin could neither name the firm nor produce documents verifying his employment.

Odofin said his ultimate destination was Texas. He was not carrying any tickets for travel to Texas.

At this time, Inspector Garibaldi informed Odofin that he was suspected of carrying narcotics internally, and he asked Odofin to consent to an x-ray. Odofin refused. It is the experience of Customs Officials that almost all people who refuse to be x-rayed by them are carrying narcotics internally.

Because Odofin was suspected of carrying narcotics internally, he was taken to Peninsula General Hospital for monitoring of his bowel movements. It is the experience of Customs Inspectors that most suspects pass the internally carried narcotics within twenty-four hours.

During his first several days at Peninsula General Hospital, Odofin refused to accept any laxatives that were offered to him. He later accepted laxatives approximately once a day. The dosage recommended in order for this laxative to be effective was once every fifteen to twenty minutes.

During the period of time between June 3, 1989 and June 11, 1989, Customs Officials guarding Odofin noticed that he went to his briefcase frequently and seemed to be looking through his papers. When Inspector Adorno interrupted him and checked the contents of the briefcase, he found that Odofin had shredded several identification documents in the name of Delaney Odofin, two of which contained Social Security numbers which have never been issued.

On June 11, 1989, Odofin was being guarded by Customs Inspector Stanley Moculeski. Odofin obtained permission from Inspector Moculeski to go to the bathroom to urinate. Once inside the bathroom Odofin sat down on the toilet and began to defecate while continuously pressing down the plunger, which resulted in the toilet being flushed non-stop. He did not respond to orders to stand up and cease flushing the toilet. When Customs Inspectors tried to pull Odofin off the toilet seat, Odofin pushed Inspector Moculeski into the bathroom door, causing injuries to Inspector Moculeski's right arm and shoulder.

On June 15, 1989 United States Magistrate Allyne Ross issued an Order permitting Peninsula General Hospital to examine if he was carrying narcotics internally. Subsequent attempts to x-ray Odofin were unsuccessful because he refused to hold still for the x-ray.

On June 23, 1989 United States District Judge Charles P. Sifton issued an Order permitting officials at Peninsula General Hospital to take whatever medical steps they deemed necessary to save Odofin's life.

On June 27, 1989 Odofin passed four balloons containing 43.9 grams of a white powdery substance while defecating. The white powder was later field-tested and proved positive for the presence of heroin.

We turn first to the ruling by the Court below on the motion to suppress. The Court below saw the need to draw a line at a point in time somewhere less than five days after Odofin's arrival, after which the

Court felt the customs officers could no longer hold Odofin without judicial authorization. However, the Court below also noted that upon the application of a lawyer for Odofin who appeared before a Magistrate on the fifth day of Odofin's detention—a proceeding which the District Court likened to habeas corpus—the Magistrate held it was reasonable to detain "Kerry Wood" (as the Court then knew him) until either an x-ray or a bowel movement told the story.[5] Accordingly, the District Court denied the motion to suppress the evidence which manifested itself after such judicial approval of the detention.

Noting that in this and related areas,[6] the Supreme Court has "consistently rejected hard-and-fast time limits," *Montoya*, 473 U.S. at 543, 105 S.Ct. at 3311 (citations omitted), we do not believe this is the case in which to draw any line, "bright"[7] or otherwise, by which time judicial approval for a border detention must be obtained, for while this detention goes far beyond any that *Montoya* envisioned, the fact is that after the fifth day the detention was subject to continuing judicial supervision and its length was at all times governed by the fact that Odofin had refused an x-ray

and effective laxatives, leaving the inspectors but two practical alternatives, "[D]etain ... for such time as necessary to confirm their suspicions, ... or turn [him] loose into the interior carrying the reasonably suspected contraband drugs." *Id.* at 543, 105 S.Ct. at 3311. Analogizing this situation to the right to detain a suspected tuberculosis carrier at the border until bodily processes dispel the suspicion so that no harmful agents will be introduced into the country, *id* at 544, 105 S.Ct. at 3312, the Supreme Court drew no other line than "bodily processes." Nor do we on these facts.[8] The agents having obtained the approval of the Magistrate for Odofin's detention, Odofin, alone, was accordingly responsible for the duration of the detention. The Customs officers were not required by the Fourth Amendment to pass him and his heroin-filled balloons into the interior. They had the right to wait him out moment-to-moment, even though Odofin's control made these moments cumulate to days and even weeks.[9]

Noting with approval that humane considerations did cause the inspectors to apply to the Court when Odofin's health appeared to be coming into risk,[10] we find

---

5. The Magistrate first found that Odofin's detention was based upon reasonable suspicion. As her ruling is supportable solely upon facts in existence at the time Odofin was initially detained, we need not speculate that Odofin would have gone free of criminal consequences from the heroin had a Magistrate reviewed the detention earlier on.

 The Magistrate then affirmed that the length of the detention was permissible, stating as follows:

 THE COURT: There comes a point in time where it is no longer reasonable to hold him. But the Court has addressed the reasonableness of it. I mean, for instance, if they were to x-ray him and there was nothing shown on the x-ray, or if he were to have a bowel movement and there was nothing shown. As a result of that they cannot hold him. This is that odd circumstances where he has refused an x-ray, which would technically clear him, if there was nothing showing on the x-ray and he hasn't as yet had a bowel movement.

6. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

7. As the Supreme Court itself earlier stated: "Much as a 'bright line' rule would be desirable,

in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." *United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985).

8. The District Court below recognized the problem, saying: "I don't know where you draw the line...."

9. Based upon a reasonable interpretation of *United States v. Montoya, supra*, the Customs inspectors had a good-faith belief that under the circumstances, they need not present the Odofin situation to a Magistrate during the first five days of detention. Whether an earlier line should be drawn, and where, must await another day. We note that none of those involved in *this* case, from its inception, have spoken with any firm conviction as to where any line should be drawn.

10. On the twelfth day, they obtained a Magistrate's order for an x-ray, but Odofin would not sit still and spoiled it. On the twentieth day, they obtained a District Court order permitting the hospital to take any medical steps necessary, should Odofin's life come in jeopardy.

that the inspector's decision to continue detaining Odofin does not convert this "reasonable alternate search method of detention [—awaiting a bowel movement—] into a Fourth Amendment violation." *United States v. Mosquera–Ramirez*, 729 F.2d 1352, 1256 (11th Cir.1984). Indeed, except for the fact that Odofin is asking this Court to draw a "line" somewhere in the first five days of detention and thereupon suppress the evidence and dismiss the heroin count, the judicial oversight exercised here by the Magistrates and a District Judge destroys any claim by Odofin of continuing judicial neglect.[11]

Similarly, we need not reach the ruling of the Court below that an "impermissible" period of delay occurred but was thereafter cured.

■ Odofin next contests the twenty-one months sentence imposed by the District Court—eighteen months for the heroin importation and a consecutive three months for the false passport—contending that the Court below should have followed the multi-count procedure set forth in Part 3D of the United States Sentencing Guidelines. He argues that the heroin importation count and the false passport count are closely-related counts within the in-coming of Section 3D1.2 and accordingly, the Court at sentencing should have determined the group offense level by applying the highest offense level of any count in the group, and accordingly sentence him to a total of eighteen months. Counts are closely related where they involve the same victim and the same act or transaction or where they involve the "same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." U.S.S.G. § 3D1.2(a), (b). Had the two counts been grouped together, the guideline range for the combined offenses would have been 15–21 months for both counts. We do not, however, find error in the District Court considering the two charges separately.

The false passport charge involved events commencing years earlier with the obtaining of the false passport and its subsequent replacement. The standard for grouping counts under § 3D1.2 is whether the counts involve the "same harm," and the interests protected by the laws regulating passports and the laws prohibiting narcotics smuggling are sufficiently different to preclude grouping under the multi-count analysis. *See United States v. Kim*, 896 F.2d 678, 687 (2d Cir.1990) (counts charging violation of immigration and currency laws not grouped under § 3D1.2). The two offenses are not "closely related" as that term is defined, *see United States v. Pope*, 871 F.2d 506 (5th Cir.1989), and therefore the Sentencing Guidelines do not require that the two counts be grouped for sentencing purposes.

Accordingly, the order of the District Court denying the motion to suppress, the judgment of conviction entered on the pleas of guilty and the sentence imposed thereon are affirmed.

---

11. But we need not reach the issue of whether within the five-day interval an order should have been sought, finding no violation of the Fourth Amendment in the circumstances of this case where the agents' well-founded suspicion <span>929 F.2d—4</span> could reasonably be expected to be confirmed or dispelled within 24 hours and the postponement beyond that interval was entirely due to conduct of the defendant.