ALTIMARI, Circuit Judge:
Defendant-appellant Chico Esieke appeals from a judgment of conviction entered in the United States District Court for the Eastern District of New York, following a jury trial before Judge I. Leo Glasser. The jury found Esieke guilty of importing and possessing with intent to distribute more than 100 grams of heroin in violation of 21 U.S.C. §§ 841(a)(1) (1988) and 952(a) (1988). On this appeal, Esieke contends, among other things, that his conviction must be reversed on the ground that the district court failed to suppress heroin seized and statements made while he was detained at the border by United States customs officials. Specifically, Es-ieke argues that suppression was warranted because his detention was neither supported by reasonable suspicion nor properly authorized by a judicial officer. He also claims that the conditions under which he was detained precluded the district court’s finding that his detention was permissible under the Fourth Amendment.
For the reasons set forth below, we affirm the judgment of the district court.
BACKGROUND
On the morning of March 10, 1990, defendant-appellant Chico Esieke arrived at John F. Kennedy Airport (“Kennedy Airport”) on a flight that originated in Lagos, Nigeria. As Esieke proceeded through the customs area of the International Arrivals *31 was stopped by Senior Inspector Dwight Powers of the U.S. Customs Service. Inspector Powers identified himself and asked to see Esieke’s passport and customs declaration card. According to Powers, Esieke appeared to be very nervous; his hands were shaking and he fumbled about as he attempted to locate and produce the requested documents.
In response to the Inspector’s questions, Esieke related that he was in the camera sales business and had travelled to Nigeria for approximately six weeks to conduct business. Esieke further stated that he was a Nigerian citizen who resided in Fort Worth, Texas and possessed a green card. Indeed, Esieke produced a Nigerian passport which had been issued in Lagos, Nigeria on March 5, 1990, ie., five days prior to his return to the United States. The passport listed Esieke’s occupation as an engineer and indicated that his previous passport had been lost. Additionally, Esieke informed Inspector Powers that, for reasons related to his camera business, he had taken $5,000 with him to Nigeria. However, Esieke subsequently remarked that he had taken only $1,000 on his trip. Es-ieke also told Powers that he expected to earn $10,000 to $15,000 in the camera business this year.
Inspector Powers accompanied Esieke to the custom’s baggage examining area and then turned his attention to Esieke’s luggage, which consisted of a small garment bag and a briefcase. Upon examination of the contents of the garment bag, Powers found that Esieke was travelling with few items of clothing. Inside the briefcase Powers found a billfold which contained a check imprinted with the name “Chico Food Market.” When Powers removed the check from the billfold, Esieke explained that he had neglected to mention that he owned a supermarket. While examining the briefcase, Powers also discovered Es-ieke’s Texas driver’s license as well as several photographs of Esieke standing next to and sitting inside a new BMW automobile. Unlike Esieke’s other forms of identification, the driver’s license included a middle name, “Oruworuowho.” After completing the luggage examination, Powers and Esieke moved to a room which was off the main floor of the International Arrivals Building.
As a result of the foregoing, Inspector Powers suspected that Esieke might be an alimentary canal smuggler, i.e., that Esieke had swallowed balloons or condoms containing narcotics that would be recovered from Esieke’s feces after he had successfully entered the United States. After conferring with his supervisor, Powers conducted a strip-search of Esieke, which failed to reveal any contraband. At this point, Powers informed Esieke that he was suspected of carrying narcotics internally and presented Esieke with an x-ray consent form, which Esieke was asked to read. In response, Esieke became extremely angry, threw the form down and asked to see his lawyer. Powers then explained that if Es-ieke did not consent to an x-ray he could be detained for monitored bowel movements. Nevertheless, Esieke refused to be x-rayed, commenting that he had been x-rayed in Dallas and that x-rays were harmful. Powers once again consulted with his supervisor, who ordered Esieke to be held for monitored bowel movements.
Additionally, at some point during the course of these events, Powers ran Es-ieke’s name and date of birth through the Treasury Enforcement Communications System Computer. The computer system revealed that “Esieke Chico Oruworuow-ho” was suspected of narcotics smuggling. Powers later learned that the alleged smuggling activities had occurred in the Dallas-Fort Worth area.
Inspector Powers informed Esieke that he was going to be detained for monitored bowel movements. Powers handcuffed Es-ieke and escorted him to a large mobile two-story structure that served as a customs detention facility. Inside the structure, Esieke changed into a hospital gown and was placed on a bed. One of his hands was secured to the bed railing by a handcuff and his legs were placed in leg irons. There were several other customs’ detainees held in the facility and, like Esieke, each was handcuffed to a bed. The detainees were permitted to leave their beds only if they needed to use the facility’s “potty seat,” which consisted of a toilet seat *32 mounted on a receptacle. On such occasions, a customs inspector would escort the detainee to the potty seat and observe as the detainee relieved himself.
During his first day in detention, Esieke failed either to defecate or urinate. The following day, around noon-time, Esieke indicated that he wanted to speak with one of the customs inspectors on duty. According to Customs Inspector Michael Snow, Esieke motioned for him to come to his bedside and then stated: “Inspector, I have been here for about a day and a half and I seen [sic] other prisoners come in and pass drugs, ... I hadn’t [sic] admitted this to anyone, but I swallowed 63 balloons.” In response, Inspector Snow called over his supervisor, Senior Inspector Thomas Falan-ga. In the presence of both Inspectors Falanga and Snow, Esieke repeated that he had swallowed 63 balloons.
Later that afternoon, Esieke moved his bowels for the first time since he had been detained. Upon examination, it was determined that Esieke had passed 24 balloons containing heroin. One of the inspectors then placed Esieke under arrest and informed Esieke of his rights. Over the course of the next day-and-a-half, Esieke, who was still being held in the customs detention facility, passed an additional 39 heroin-filled balloons.
On the morning of March 13, after Es-ieke passed the final balloon, an agent of the Drug Enforcement Administration (“DEA”) took custody of Esieke. The DEA agent again read Esieke his rights and drove him to the United States Courthouse for the Eastern District of New York. En route, Esieke questioned the DEA agent about the weight of the drugs he had passed. The agent stated that the gross weight, i.e., the weight of both the drugs and the balloons, was 600 to 700 grams. Esieke then commented that he thought he had swallowed only 300 grams. In response, the agent explained that the net weight is usually several hundred grams lower than the gross weight. During the ride, Esieke also admitted that the “stuff” was supposed to go to Baltimore.
A superseding indictment was ultimately filed against Esieke, charging him with importing into the United States over 100 grams of heroin, in violation of 21 U.S.C. § 952(a), and with possessing with intent to distribute over 100 grams of heroin, in violation of 21 U.S.C. § 841(a)(1).
Prior to trial, Esieke moved to suppress both the heroin contained in the balloons he had internally smuggled and the various statements he made during his detention and trip to the Courthouse. Esieke essentially argued that suppression was warranted because the customs inspectors’ decision to detain him was not supported by reasonable suspicion and, consequently, that evidence obtained as a result of that detention was the product of a seizure in violation of the Fourth Amendment. A suppression hearing was held before District Judge Glasser, at which Senior Inspector Powers was the sole witness. Following the hearing, the district court denied Esieke’s motion to suppress.
Thereafter, Judge Glasser sua sponte raised the issue of whether Esieke’s statements had been obtained during the course of a custodial interrogation at which Es-ieke — despite his request to speak with a lawyer — was not represented by counsel. As a result, the government was required to call two additional witnesses who testified to the circumstances in which Esieke’s statements were made. Based on the witnesses’ testimony, Judge Glasser determined that Esieke’s statements were not the product of a custodial interrogation and were voluntarily made during conversations initiated by Esieke. Accordingly, the district court again concluded that there was no need to suppress the statements.
The case proceeded to trial and Esieke was found guilty on both counts of the indictment.
DISCUSSION
On this appeal, as in district court, Es-ieke primarily argues that his detention was not supported by reasonable suspicion and, therefore, that the products of that detention must be suppressed. In addition, Esieke suggests that extended border detentions violate the Fourth Amendment unless authorized by a judicial officer. We disagree with both contentions.
*33 In United States v. Montoya de Hernandez, 473 U.S. 531, 541-42, 105 S.Ct. 3304, 3310-11, 87 L.Ed.2d 381 (1985), the Supreme Court considered the unique problems presented by the advent of alimentary canal smuggling. In that case, customs officials at Los Angeles International Airport stopped and questioned respondent Rosa Montoya de Hernandez, who had arrived on a flight from Bogota, Colombia. The officials suspected that Montoya was an alimentary canal smuggler. When she declined to undergo an x-ray examination and could not be placed on a return flight to Colombia, Montoya was detained. After more than sixteen hours, the customs officials obtained a court order authorizing a rectal examination and an involuntary x-ray. The rectal examination resulted in the discovery of the first of 88 cocaine-filled balloons. The district court denied Montoya’s motion to suppress the cocaine contained in the balloons, and Montoya was convicted of possession with intent to distribute and of unlawful importation of cocaine. The case was ultimately appealed to the Supreme Court.
Writing on behalf of the Court, the present Chief Justice stressed that, consistent with “Congress’ power to protect the Nation by stopping and examining persons entering this country, the Fourth Amendment’s balance of reasonableness is qualitatively different at the ... border than in the interior.” Id. at 538, 105 S.Ct. at 3309. Chief Justice Rehnquist also emphasized that individuals presenting themselves for entry into the United States have a lesser expectation of privacy at the border than in the interior. Id. at 539-40, 105 S.Ct. at 3309-10; see also United States v. Sanders, 663 F.2d 1, 2-3 (2d Cir.1981) (“Border searches are, and always have been, sui generis.”). Based on these considerations, the Court stated:
We hold that the detention of a traveler at the border, beyond the scope of a routine customs search and inspection, is justified at its inception if customs agents, considering all the facts surrounding the traveler and her trip, reasonably suspect that the traveler is smuggling contraband in her alimentary canal.
The “reasonable suspicion” standard has been applied in a number of contexts and effects a needed balance between private and public interests when law enforcement officials must make a limited intrusion on less than probable cause. It thus fits well into the situations involving alimentary canal smuggling at the border: this type of smuggling gives no external signs and inspectors will rarely possess probable cause to arrest or search, yet governmental interests in stopping smuggling at the border are high indeed. Under this standard, officials at the border must have a “particularized and objective basis for suspecting the particular person” of alimentary canal smuggling.
Montoya, 473 U.S. at 541-42, 105 S.Ct. at 3310-11 (footnote omitted) (quoting United States v. Cortez, 449 U.S. 411, 417, 418,101 S.Ct. 690, 694, 695, 66 L.Ed.2d 62Í (1981)); see also United States v. Odofin, 929 F.2d 56, 57 & n. 1 (2d Cir.1991); United States v. Reyes, 821 F.2d 168, 169-70 (2d Cir.1987), cert. denied, 484 U.S. 1068, 108 S.Ct. 1032, 98 L.Ed.2d 996 (1988). In essence, the Court concluded that an extended border detention of a suspected alimentary canal smuggler would not violate the Fourth Amendment, so long as reasonable suspicion supported the decision to detain the suspect.
The Court then went on to consider whether the more than sixteen hour “detention of [Montoya] was reasonably related in scope to the circumstances which justified it initially.” Montoya, 473 U.S. at 542, 105 S.Ct. at 3311. Chief Justice Rehnquist’s analysis of this issue began with an admonition that “courts should not indulge in ‘unrealistic second-guessing,’ ” and that “ ‘creative judge[s], engaged in post hoc evaluations of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished.’ ” Id. (quoting United States v. Sharpe, 470 U.S. 675, 686-87, 105 S.Ct. 1568, 1575-76, 84 L.Ed.2d 605 (1985)). The Court went on to make the following observations:
*34 The rudimentary knowledge of the human body which judges possess in common with the rest of humankind tells us that alimentary canal smuggling cannot be detected in the amount of time in which other illegal activity may be investigated through brief Tbrry-type stops.... In the case of respondent the inspectors had available, as an alternative to simply awaiting her bowel movement, an x ray. They offered her the alternative of submitting herself to that procedure. But when she refused that alternative, the customs inspectors were left with only two practical alternatives: detain her for such time as necessary to confirm their suspicions, a detention which would last much longer than the typical Terry stop, or turn her loose into the interior carrying the reasonably suspected contraband drugs.
The inspectors in this case followed this former procedure. They no doubt expected the respondent ... would produce a bowel movement without extended delay. But her visible efforts to resist the call of nature ... disappointed this expectation and in turn caused her humiliation and discomfort. Our prior cases have refused to charge police with delays in investigatory detention attributable to the suspect’s evasive actions and that principle applies here as well. Respondent alone was responsible for much of the duration and discomfort of the seizure.
Montoya, 473 U.S. at 543, 105 S.Ct. at 3311-12 (citations omitted). Accordingly, Montoya’s detention was held to be reasonable under the Fourth Amendment.
More recently, in United States ¶. Odo-fin this Court rejected a claim that a five-day border detention without judicial authorization was so long as to violate the Fourth Amendment. In that case, appellant Delaney Abi Odofin was detained by customs officials who suspected that he was an alimentary canal drug smuggler. Like Esieke and Montoya, Odofin refused to consent to an x-ray. After five days of detention without a bowel movement, a lawyer for Odofin appeared before a Magistrate and argued that the continued detention of Odofin was unreasonable. The Magistrate disagreed and permitted the detention to continue. Ultimately, Odofin was held for a total of twenty-four days until he began to pass several balloons containing narcotics. On appeal, we found “no violation of the Fourth Amendment ... where the [customs] agents’ well-founded suspicion could reasonably be expected to be confirmed or dispelled within 24 hours and the postponement beyond that interval was entirely due to conduct of the defendant.” Odofin, 929 F.2d at 61 n. 11; see also United States v. Mosquera-Ramirez, 729 F.2d 1352, 1356 (11th Cir.1984).
Turning to the present case, we are convinced that a variety of factors provided Inspector Powers with ample justification for initially detaining Esieke. During his encounter with Inspector Powers, Esieke appeared to be excessively nervous. In response to Powers’ routine questioning, Esieke provided contradictory information about his employment and the amount of money he had taken to Nigeria. Esieke was travelling from Nigeria, which, according to the government, is a source country for narcotics and, despite a six-week stay, Esieke was travelling with few items of clothing. While in Nigeria, Esieke had reported that his passport was lost and thereby obtained a replacement passport that concealed the frequency and destination of his prior travel. Moreover, a computer search revealed that an individual with Esieke’s name and date of birth was suspected of narcotics smuggling. Finally, the customs inspectors’ suspicions were enhanced when Esieke belligerently refused to undergo an x-ray that might have conclusively established whether or not he was internally smuggling contraband. Considering the totality of these circumstances, we have no difficulty concluding that the decision to detain Esieke was supported by reasonable suspicion and did not violate the Fourth Amendment. See Reyes, 821 F.2d at 169-70; United States v. Asbury, 586 F.2d 973, 976-77 (2d Cir.1978).
We are also satisfied that the length of Esieke’s detention did not give rise to a *35 Fourth Amendment violation. Montoya and Odofin clearly instruct that once reasonable suspicion exists to detain a traveler, the detention can continue “for the period of time necessary to either verify or dispel the suspicion.” Montoya, 473 U.S. at 544, 105 S.Ct. at 3312; see Odofin, 929 F.2d at 60-61 & n. 11; United States v. Oyekan, 786 F.2d 832, 836 (8th Cir.1986). In other words, an otherwise permissible border detention does not run afoul of the Fourth Amendment simply because a detainee’s intestinal fortitude leads to an unexpectedly long period of detention. Here, the customs agents initially offered Esieke the option of undergoing an x-ray examination. Once Esieke rejected that alternative, the officials had little choice but to detain him and “wait him out moment-to-moment.” Odofin, 929 F.2d at 60. Since any undue delay was the consequence of Esieke’s own obstinacy, he alone was responsible for the duration of his detention.
Esieke next contends that a border detention must be treated as a quasi-arrest requiring prompt judicial determination of the grounds supporting the officer’s decision to seize the detainee. Cf County of Riverside v. McLaughlin, — U.S. -, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991); Gerstein v. Pugh, 420 U.S. 103, 114-16, 125, 95 S.Ct. 854, 863-64, 868, 43 L.Ed.2d 54 (1975). Unlike an actual or de facto arrest, an extended border detention of a suspected alimentary canal smuggler does not implicate the Fourth Amendment’s warrant clause and, accordingly, does not require judicial approval. Compare Hayes v. Florida, 470 U.S. 811, 814-17, 105 S.Ct. 1643, 1645-47, 84 L.Ed.2d 705 (1985) with Montoya, 473 U.S. at 541, 105 S.Ct. at 3310. Further, in contrast to a Terry-s\ag, such a border detention need not be brief and minimally intrusive. Compare Terry v. Ohio, 392 U.S. 1, 24-27, 88 S.Ct. 1868, 1881-83, 20 L.Ed.2d 889 (1968) with Montoya, 473 U.S. at 543-44, 105 S.Ct. at 3311-12. Rather, the Supreme Court has advised that the border “detention of a suspected alimentary canal smuggler ... is analogous to the detention of a suspected tuberculosis carrier at the border: both are detained until their bodily processes dispel the suspicion that they will introduce a harmful agent into this country.” Montoya, 473 U.S. at 544, 105 S.Ct. at 3312 (citing 8 U.S.C. § 1222); see Odofin, 929 F.2d at 60. Accordingly, we do not believe that the Fourth Amendment requires us “to draw any line, ‘bright’ or otherwise, by which time judicial approval for a border detention must be obtained.” Odofin, 929 F.2d at 60 (footnote omitted). As explained above, the length of an extended border detention is governed by the detainee’s bodily processes, not by a clock.
We now turn to what is the most vexing issue presented by this appeal — whether the conditions of Esieke’s detention violated the Fourth Amendment. As stated above, Esieke was held for one-and-one-half days until he had his first bowel movement, and then for another one-and-one-half days until he had expelled all 63 balloons from his body. During that time, he was forced to wear leg irons and was handcuffed to a bed. Further, he was not permitted to leave the bed, except in the company of a customs inspector, and then only to use a makeshift toilet. According to Esieke, these conditions demonstrate that his detention violated the Fourth Amendment.
At oral argument, in response to questioning by the Court, the government explained that Esieke was forced to wear handcuffs and leg irons because suspected narcotic smugglers present a potential threat to the customs inspectors as well as to themselves. We certainly agree that law enforcement officials “ha[ve] a right to take reasonable steps to protect [themselves] ... regardless of whether probable cause to arrest exists.” United States v. Alexander, 907 F.2d 269, 272 (2d Cir.1990), cert. denied, — U.S. -, 111 S.Ct. 983, 112 L.Ed.2d 1067 (1991). However, the use of handcuffs and leg irons strongly suggests that the detainees pose a very real and imminent threat of physical violence. While we need not decide whether such a risk is actually presented, we do take notice of the fact that the individuals being detained on suspicion of alimentary canal smuggling are subjected to strip searches, are clad solely in hospital gowns and pre *36 sumably are in less than peak physical condition. We therefore question whether the risk they pose is as extreme as the government imagines. Furthermore, it seems to us that the officials responsible for devising the detention procedures utilized at Kennedy Airport have approached their duties with an unwarranted degree of callousness and may have lost sight of the fact that the persons they detain are merely suspects who have not yet been—and may never be—charged with a crime.
With this said, we are nonetheless unpersuaded that the use of handcuffs and leg irons converted an otherwise permissible detention into a detention in violation of the Fourth Amendment. Under both Montoya and Odofin, it clearly is permissible to detain incommunicado a traveler suspected of alimentary canal smuggling, against his or her will, in the confines of a guarded room, until the person has had a bowel movement. It is doubtful, although barely so, that the use of handcuffs and leg irons during such a border detention dramatically alters the Fourth Amendment analysis. While we acknowledge that this is an extremely close ease, we believe that prior precedent compels a holding that Esieke’s detention did not violate the Fourth Amendment. See Montoya, 473 U.S. at 542-43, 105 S.Ct. at 3311-12; Odofin, 929 F.2d at 60-61.
We also note that, although not raised below, Esieke now argues that several of the statements admitted against him at trial were the product of the coercive conditions of his detention and therefore were not voluntarily obtained. Of course, this appeal is not an appropriate vehicle to consider de novo Esieke’s late claim that his statements were coerced. Moreover, even if we were to hold that those statements made by Esieke while he was handcuffed to the bed should have been suppressed, there remains overwhelming evidence of his guilt. Therefore, any possible error in failing to suppress the challenged statements was harmless.
As the foregoing discussion explains, the Fourth Amendment is not violated by the type of detention to which Esieke was subjected. Nevertheless, we are seriously troubled by the government’s practice of detaining suspects for fairly extensive periods of time without judicial authorization. Underlying Montoya and its progeny is an assumption that natural forces will compel a traveler, who has just completed a long journey by airplane, to move his bowels within a relatively short time of his arrival. See Montoya, 473 U.S. at 543, 105 S.Ct. at 3311; Odofin, 929 F.2d at 60-61 & n. 11. Unfortunately, alimentary canal smugglers have proven unusually adept at staving off the call of nature. While the suspected smuggler is clearly responsible for such delay, this fact does not minimize our concern about the potential health hazards posed by allowing this physiological drama to play itself out. Moreover, with all due respect to the U.S. Customs Service, we are deeply distressed by the notion that individuals are being constrained in handcuffs and leg irons for days and possibly weeks based solely on a customs agent’s reasonable suspicion. Consequently, we believe that the interests of justice, as well as the potential health risks engendered by the detention of suspected alimentary canal smugglers, necessitate some form of judicial oversight.
At oral argument, the government informed the Court that it is now standard policy in the Eastern District of New York to notify the U.S. Attorney within 72 hours when conducting an extended border detention of a suspected alimentary canal smuggler. We do not think this is sufficient. Henceforth, the U.S. Customs Service—or any other governmental agency overseeing such detentions—shall inform the local U.S. Attorney within 24 hours of its decision to detain a suspected alimentary canal smuggler. In turn, the U.S. Attorney shall immediately notify a United States Magistrate Judge and detainee’s legal counsel (or the Legal Aid Society) of the ongoing detention.
CONCLUSION
We have reviewed each of defendant-appellant’s remaining arguments and find *37 them to be without merit. For the reasons stated above, the judgment of conviction is affirmed.