[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 27, 2010
JOHN LEY
CLERK

No. 08-16442

_____

D. C. Docket No. 08-20377-CR-UU

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

HILARIO ALFARO-MONCADA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 27, 2010)

Before CARNES and HULL, Circuit Judges, and LAWSON,* District Judge.

CARNES, Circuit Judge:

_____

*Honorable Hugh Lawson, United States Senior District Judge for the Middle District of Georgia, sitting by designation.

A lot of child pornography cases come through our court, and most of them present fairly routine issues. This one, however, brings in tow a Fourth Amendment issue with important implications for the national security of the United States. When a foreign cargo vessel enters this country and is subject to a border search, may the cabins of its crew members be searched for contraband without reasonable suspicion?

## I.

On April 16, 2008, the MV RIO MIAMI, a foreign cargo ship, docked at the Antillean Marine inside Miami, Florida after traveling from the Dominican Republic. The Antillean Marine is located approximately three miles inland on the Miami River. It was the ship's first port of entry into the United States. A couple of hours after the ship came into this country, officials with United States Customs and Border Protection, which is part of the Department of Homeland Security, went on board the ship to conduct an agricultural re-boarding.[1] The

---

[1]The agricultural re-boarding was the second inspection of the RIO MIAMI. Shortly after it arrived in the United States, Customs and Border Protection officials performed an initial boarding. During the initial boarding, a passenger processing team issued landing permits to the people on the RIO MIAMI, and an agricultural team completed paperwork clearing the ship's food waste and garbage for unloading.

purpose of an agricultural re-boarding, or at least the primary purpose of the one in this case, is to inspect a ship for prohibited agricultural materials, including seeds.[2]

The re-boarding of the RIO MIAMI was performed by a group of Customs and Border Protection officials called the Agricultural Enforcement Team. Among its seven members were five people trained in detecting threats to agriculture: three agricultural specialists, including Specialist Luis Meyer, plus a senior agricultural officer and a supervisor.[3] The other two members were

---

[2]The Homeland Security Act of 2002 transferred personnel and authority for agricultural border inspections from the United States Department of Agriculture to Customs and Border Protection. See 6 U.S.C. §§ 202(7), 231. Customs and Border Protection performs agricultural inspections at ports of entry in order to enforce various animal and plant protection laws. Ruth Ellen Wasem, Cong. Research Serv., Border Security: Inspections Practices, Policies, and Issues 8–9 (2004); see § 231 (requiring the Department of Homeland Security to conduct agricultural import and entry inspection activities under the following laws: The Honeybee Act, 7 U.S.C. §§ 281–286; The Federal Seed Act, 7 U.S.C. §§ 1581–1586 (Title III); The Plant Protection Act, 7 U.S.C. §§ 7701–7786; The Animal Health Protection Act, 7 U.S.C. 8301–8322; The Lacey Act Amendments of 1981, 16 U.S.C. §§ 3371–3378; The Virus-Serum-Toxin Act, 21 U.S.C. §§ 151–159; and The Endangered Species Act of 1973, § 11, 16 U.S.C. § 1540).

[3]See Introducing the New CBP Agriculture Specialist, Customs & Border Protection Today, May 2004, http://www.cbp.gov/xp/CustomsToday/2004/May/agSpec.xml (Agricultural specialists "determine the admissibility of agriculture commodities while preventing the introduction of harmful pests, diseases, and potential agro/bioterrorism into the United States"); Jim Monke, Cong. Research Serv., Agroterrorism: Threats and Preparedness 17 (rev. 2006) (Agricultural specialists attend an 8-week training program at a Department of Agriculture facility on agricultural issues and 2-weeks of law enforcement classes); Fed. Law Enforcement Training Ctr., Dep't of Homeland Sec., Catalog of Training Programs 145 (rev. 2007) (Customs and Border Protection "[o]fficers are trained in basic law enforcement skills, including: Anti-Terrorism; Detection of Contraband; . . . Immigration and Naturalization laws; U.S. Customs Export and Import laws; . . . [and] Examination of Cargo, Bags, and Merchandise."); Gen. Accounting Office, Homeland Security: Management and Coordination Problems Increase the Vulnerability of U.S. Agriculture to Foreign Pests and Disease 15 (2006) (Customs and Border Protection officers receive 16 hours of training on agricultural issues); Introducing the New CBP Agriculture Specialist (noting that Customs and Border Protection officers perform different

Customs and Border Protection officers, one of whom was Officer Ernesto Quiñones. The Team met with the captain of the RIO MIAMI and told him that they would be inspecting the ship from bow to stern. After the Team inspected the bridge, Specialist Meyer and Officer Quiñones went below to inspect the crew members' cabins. The captain, who was with them, had a master key that unlocked the cabins, which were arranged like hotel rooms—one right beside another. The captain went from cabin to cabin, unlocking and opening each door so that the cabins could be searched. The master key would not open the cabin of Hilario Alfaro-Moncada, a citizen of El Salvador, who was the ship's cook.

While Agricultural Specialist Meyer and Officer Quiñones waited in the hall, the captain went and got Alfaro-Moncada who unlocked his cabin door with his key and opened it. Specialist Meyer asked Alfaro-Moncada if the cabin was his, if he owned everything in it, and if Meyer could inspect it. After Alfaro-

---

duties than Agricultural Specialists but "receive agriculture fundamentals training that [allows] them to recognize the signs of possible agriculture anomalies").

(In keeping with Eleventh Circuit Internal Operating Procedure 10, "Citation to Internet Materials in an Opinion," under Federal Rule of Appellate Procedure 36, a copy of the internet materials cited in this opinion is available at this Court's Clerk's Office.)

Moncada answered "yes" to all three questions, Meyer entered the cabin and began inspecting it.[4]

Alfaro-Moncada's cabin was small and its only furniture was a couch, bed, and desk. Specialist Meyer started his inspection on the left side of the cabin where the couch was located. He searched some luggage and sifted through some clothes that were strewn on the couch. Finding nothing of interest, Meyer moved on to Alfaro-Moncada's bed, which was positioned in the center of the cabin. Meyer lifted the mattress and rummaged through some drawers running down the side of the bed. Again finding nothing of interest, he moved on.

Specialist Meyer's efforts then focused on Alfaro-Moncada's desk, which was located to the right of the bed and had a DVD player sitting on top of it. Meyer searched the top of the desk and then opened the desk's only drawer. Inside the drawer were cases for CDs and DVDs. Meyer took some of them out of the drawer and began examining them. He looked at the covers of the cases. One of the DVD covers caught his attention because on that cover were ten images of what appeared to be young girls engaging a variety of sexual acts. Suspecting that

---

[4]The government did not argue before the district court that the search was permissible because of Alfaro-Moncada's consent, and it does not make that argument to us either. So we will not consider that possibility. See Wagner v. Daewoo Heavy Indus. Am. Corp., 314 F.3d 541, 542 (11th Cir. 2002) (en banc) ("[T]he general rule of this Circuit [is] that issues not raised before the district court will not be considered on appeal.").

the images were child pornography, Meyer called for Officer Quiñones who by that time had started searching another crew member's nearby cabin.

When Officer Quiñones arrived, Specialist Meyer handed him the DVD case and Quiñones examined it. Quiñones then asked Alfaro-Moncada whether it belonged to him and whether he knew what was on the DVD inside. Alfaro-Moncada admitted that it was his and that he knew there was pornography on the DVD and when asked what kind of pornography, he said "little girls." Quiñones got Alfaro-Moncada's permission to watch the DVD, but then continued the search of the desk drawer that Meyer had begun. He found a second DVD case that depicted young girls engaging in sex acts. The title of that DVD was "Vacanales del Porno," which translates to "Porno Parties." The actual DVD inside the case had Alfaro-Moncada's initials—"H.A.M."—on it, as well as "del X," which translates to "triple X."

After finding the second DVD, Officer Quiñones asked Alfaro-Moncada if it also belonged to him and if Quiñones could watch it. Alfaro-Moncada again answered "yes" to both questions. Quiñones then used Alfaro-Moncada's player to watch portions of both DVDs and confirmed that they contained child pornography. After that, Alfaro-Moncada's cabin was secured and he was taken into custody.

6

II.

A grand jury sitting in the Southern District of Florida returned an indictment charging Alfaro-Moncada with possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B). Two weeks after being indicted, he filed a motion to suppress the DVDs and his statements about them, contending that the search of his cabin had violated his Fourth Amendment rights. After conducting an evidentiary hearing, a magistrate judge reported that the search of Alfaro-Moncada's cabin was a routine border search requiring no level of suspicion and recommended that the suppression motion be denied. The district court adopted the magistrate judge's report and recommendation and denied the motion.

III.

Alfaro-Moncada's trial took only a day. The government presented the testimony of Specialist Meyer and Officer Quiñones and introduced into evidence, among other things, five still images taken from the DVDs. Alfaro-Moncada objected to the images' admission, protesting that he had stipulated that the DVDs contained child pornography.

Alfaro-Moncada took the stand and testified that he bought both DVDs at a flea market in Colombia. An apparently indiscriminate shopper, Alfaro-Moncada claimed that he purchased the DVDs without knowing what they were or really

7

looking at them.  He said that it was not until he got back to the ship and watched parts of them that he realized that they contained child pornography.  Once he realized what they were, he tossed them in his desk drawer planning to throw them overboard later.  He testified that the reason he never got rid of the DVDs was that he had gotten busy, rough seas had made him ill, and he had forgotten about them.  Rejecting Alfaro-Moncada's story, the jury found him guilty as charged of possession of child pornography.

At sentencing, the district court determined that Alfaro-Moncada's base offense level was 18.  See U.S.S.G. § 2G2.2(a)(1).  That was enhanced two points because the DVDs depicted children under the age of twelve, see § 2G2.2(b)(2), four points because the DVDs portrayed "sadistic or masochistic conduct or other depictions of violence," see § 2G2.2(b)(4), and five more points because the DVDs contained more than 600 images of child pornography, see § 2G2.2(b)(7)(D).  The result was a total offense level of 29.  Because he had no criminal record, Alfaro-Moncada had a criminal history category of I.  See U.S.S.G. Ch. 5 Pt. A.  The resulting guidelines range was 87 to 108 months imprisonment.  See id.  The district court imposed a sentence of 87 months in prison and 10 years of supervised release.

IV.

Alfaro-Moncada contends that: (1) his motion to suppress should have been granted because the search of his cabin violated his Fourth Amendment rights; (2) there was insufficient evidence to support his conviction; (3) the district court erred in allowing the government to show five still images from the DVDs to the jury after he had stipulated that they contained child pornography; and (4) his 87-month sentence is unreasonable.

A.

Searches conducted at the border are analyzed in two steps. See United States v. Ramsey, 431 U.S. 606, 97 S.Ct. 1972 (1977). The first step is to determine if the search was authorized by statute, see id. at 611–15; 97 S.Ct. at 1976–78, and, if so, the second step is to decide if the search was reasonable under the Fourth Amendment, see id. at 615–16; 97 S.Ct. at 1978.

The government contends that the Agricultural Enforcement Team was authorized by 19 U.S.C. § 1581(a) to search Alfaro-Moncada's cabin. That statute provides that any "officer of the customs" may "at any time go on board of any vessel . . . at any place in the United States" and "search the vessel . . . and every part thereof." 19 U.S.C. § 1581(a). An "officer of the customs" includes "any officer of the United States Customs Service . . . or any agent or other person . . .

9

authorized by law . . . to perform any duties of an officer of the Customs Service."

Id. § 1401. The Homeland Security Act of 2002 transferred all customs functions, with the exception of certain revenue-related ones, to the Department of Homeland Security. See 6 U.S.C. §§ 203(1), 212(a)(1). Customs border activities are now performed by United States Customs and Border Protection, which is part of the Department of Homeland Security. See Ruth Ellen Wasem, Cong. Research Serv., Border Security: Inspections Practices, Policies, and Issues 6 (2004). The members of the Agricultural Enforcement Team, all employees of Customs and Border Protection, were thus "officer[s] of the customs" within the meaning of § 1581(a). The Team boarded the RIO MIAMI while it was docked three miles up the Miami River, which is a "place in the United States," and Alfaro-Moncada's cabin was a part of the ship. See § 1581(a) (allowing officer of the customs to "search the vessel . . . and every part thereof"). The Team therefore had statutory authority under § 1581(a) to search the cabin.

Of course, "no Act of Congress can authorize a violation of the Constitution," Almeida-Sanchez v. United States, 413 U.S. 266, 272, 93 S.Ct. 2535, 2539 (1973), which brings us to the second step of the Ramsey analysis: whether the statutorily authorized search violated the Fourth Amendment. Neither the Supreme Court nor this Court has ever addressed § 1581(a)'s constitutionality

10

in the circumstances presented by this case. The Supreme Court has, however, upheld the constitutionality of § 1581(a) to the extent that it authorizes customs officers, without any level of suspicion, to board vessels located in waters providing ready access to the open seas and conduct a document inspection. See United States v. Villamonte-Marquez, 462 U.S. 579, 588–593, 103 S. Ct. 2573, 2579–2582 (1983). In doing so, the Supreme Court noted the broad grant of authority that § 1581(a) confers on customs officers but expressly limited its decision to document inspections. See id. at 581 n.2, 103 S.Ct. at 2575 n.2. More recently, the Supreme Court held that § 1581(a) authorizes customs officers, without any level of suspicion, to remove, disassemble, and reassemble an automobile's gas tank to look for contraband while the automobile is located at a secondary inspection area at the border. See United States v. Flores-Montano, 541 U.S. 149, 153–56, 124 S.Ct. 1582, 1585–87 (2004).

When the RIO MIAMI, including Alfaro-Moncada's cabin, was searched, it was docked at the functional equivalent of the border—making this a border search case. See United States v. Moreno, 778 F.2d 719, 721 (11th Cir. 1985) (noting that the point where a ship first docks after arriving from a foreign country is the functional equivalent of the border). If the Agricultural Enforcement Team had boarded the RIO MIAMI to perform a document inspection, Villamonte-

11

Marquez probably would control, and if the Team had searched equipment or cargo on the vessel the Flores-Montano decision probably would control. What distinguishes this case from those two and makes it more difficult is that the search was of living quarters on a vessel. The issue is whether a search without reasonable suspicion of a crew member's living quarters on a foreign cargo vessel that is entering this country is unreasonable for Fourth Amendment purposes.

To determine the reasonableness of a border search, or of any search for that matter, we weigh "its intrusion on [an] individual's Fourth Amendment interests against its promotion of legitimate governmental interests." United States v. Denson, 574 F.3d 1318, 1338 (11th Cir. 2009) (quotation marks omitted); see also United States v. Richards, 638 F.2d 765, 770 (5th Cir. Mar. 1981)[5] ("Because the Fourth Amendment expressly prohibits only unreasonable warrantless searches, it patently incorporates a balancing test, weighing in one measure the level of intrusion into individual privacy and in the other the public interest to be served."); United States v. Himmelwright, 551 F.2d 991, 994 (5th Cir. 1977) (same).

---

[5]We adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

12

Even though it does involve weighing individual privacy and public interests, "the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior." United States v. Montoya de Hernández, 473 U.S. 531, 538, 105 S.Ct. 3304, 3309 (1985). At the border, an individual has a lesser expectation of privacy, the government a greater interest in searching, and the balance between the interests of the government and the privacy right of the individual is struck more favorably to the government. Id. at 539–40, 105 S.Ct. at 3309–10 (citations omitted). The United States' paramount interest in conducting searches at its borders is national self-protection. See Flores-Montano, 541 U.S. at 153, 124 S.Ct. at 1586 ("It is axiomatic that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity."); id. at 152, 124 S.Ct. at 1585 ("The Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border."); Carroll v. United States, 267 U.S. 132, 154, 45 S.Ct. 280, 285 (1925) ("Travelers may be so stopped in crossing an international boundary because of national self-protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in."); see also Bourgeois v. Peters, 387 F.3d 1303, 1315 (11th Cir. 2004) (noting that transborder travel is a

13

context in which compelling state interests diminish an individual's expectation of privacy); United States v. Chemaly, 741 F.2d 1346, 1350 (11th Cir. 1984) (observing that the Fourth Amendment is relaxed at the border "[b]ecause of the strong policy of national self protection").

Because of the United States' strong interest in national self-protection, "[r]outine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant." Montoya de Hernández, 473 U.S. at 538; 105 S.Ct. at 3309; see also Denson, 574 F.3d at 1339 ("It is beyond peradventure that searches made at the border, pursuant to the long-standing right of the sovereign to protect its territorial integrity, renders preliminary searches and seizures per se reasonable . . . . Entrants, therefore, are subject to search even in the absence of reasonable suspicion, probable cause, or warrant." (citations omitted)). A person may be subjected to a pat-down search or frisk. See United States v. Ramos, 645 F.2d 318, 322 (5th Cir. Unit B 1981) ("[A] routine, non-offensive pat-down or frisk made at the border is justified [solely] by a traveler's request to cross our national border."). A traveler's luggage may be inspected. See United States v. Rice, 635 F.2d 409, 410 (5th Cir. Unit B 1981) (noting that no articulable suspicion is required to conduct a routine search of luggage at the border). Incoming international mail may be examined. See United

14

States v. Pringle, 576 F.2d 1114, 1117–18 (5th Cir. 1978) (upholding

suspicionless search of incoming international mail).  Vehicles may be searched.

See United States v. Emmens, 893 F.2d 1292, 1294 (11th Cir. 1990) ("[N]either a

warrant nor any level of suspicion is required to search vehicles, including aircraft,

arriving in the United States.").  All without any level of suspicion.  Those

searches are "reasonable simply by virtue of the fact that they occur at the border."

Denson, 574 F.3d at 1339; see also Nat'l Treasury Employees Union v. Von Raab,

489 U.S. 656, 665, 109 S.Ct. 1384, 1390 (1989) ("[N]either a warrant nor probable

cause, nor, indeed, any measure of individualized suspicion, is an indispensable

component of reasonableness in every circumstance."); Skinner v. Ry. Labor

Executives' Ass'n, 489 U.S. 602, 624, 109 S.Ct. 1402, 1417 (1989) ("In limited

circumstances, where the privacy interests implicated by the search are minimal,

and where an important governmental interest furthered by the intrusion would be

placed in jeopardy by a requirement of individualized suspicion, a search may be

reasonable despite the absence of such suspicion."); Ramsey, 431 U.S. at 619, 97

S.Ct. at 1980 ("Border searches, then, from before the adoption of the Fourth

Amendment, have been considered to be 'reasonable' by the single fact that the

person or item in question had entered into our country from outside.").

Even at the border, however, reasonable suspicion is required for highly intrusive searches of a person's body such as a strip search or an x-ray examination. See, e.g., Brent v. Ashley, 247 F.3d 1294, 1302 (11th Cir. 2001) (concluding that strip search of airline passenger arriving at Miami International Airport from Nigeria without reasonable suspicion that the passenger was smuggling drugs violated the Fourth Amendment); United States v. McMurray, 747 F.2d 1417, 1420 (11th Cir. 1984) ("A strip search requires a particularized 'reasonable suspicion.' This standard is met 'by a showing of articulable facts which are particularized as to the person and as to the place to be searched.'" (citations omitted)); United States v. Mosquera-Ramirez, 729 F.2d 1352, 1353 (11th Cir. 1984) ("[A]n x-ray search performed at the border is reasonable if based on the same amount of suspicion required for a strip search."); United States v. De Gutierrez, 667 F.2d 16, 19 (11th Cir. 1982) ("The well-established rule in this circuit is that a strip search conducted at the border meets the requirements of the fourth amendment if it is supported by 'reasonable suspicion' on the part of the customs agent.").[6]

---

[6]In Montoya de Hernández, the Supreme Court held that "the detention of a traveler at the border, beyond the scope of a routine customs search and inspection, is justified at its inception if customs agents, considering all the facts surrounding the traveler and her trip, reasonably suspect that the traveler is smuggling contraband in her alimentary canal." 473 U.S. at 541, 105 S.Ct. at 3310. The Court did not decide "what level of suspicion, if any, is required for nonroutine border searches such as strip, body cavity, or involuntary x-ray searches." Id. at 541 n.4, 105

While Alfaro-Moncada was not subjected to a highly intrusive search of his body, his cabin was searched and that implicates significant Fourth Amendment principles. A cabin is a crew member's home—and a home "receives the greatest Fourth Amendment protection." See United States v. McGough, 412 F.3d 1232, 1236 (11th Cir. 2005); see also Kyllo v. United States, 533 U.S. 27, 31, 121 S.Ct. 2038, 2041 (2001) ("'At the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" (quoting Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 683 (1961))); Payton v. New York, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379 (1980) ("[T]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." (quotation marks United States v. Mosquera-Ramirez, 729 F.2d 1352, 1353 (11th Cir. 1984) omitted)); id. at 590, 100 S.Ct. at 1382 ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house.").

In none of those decisions discussing the Fourth Amendment protections afforded to the home was it at the border, and on that critical distinction this case turns. A home in a fixed location within the United States cannot be used as a

S.Ct. at 3310 n.4. We have set that level of suspicion at reasonable suspicion. See United States v. Mosquera-Ramirez, 729 F.2d 1352, 1353 (11th Cir. 1984); United States v. Vega-Barvo, 729 F.2d 1341, 1345 (11th Cir. 1984).

means to transport into this country contraband or weapons of mass destruction that threaten national security.  A crew member's cabin, like the rest of the ship on which it is located, can and does pose that threat.  See Dep't of Homeland Sec., The National Strategy for Maritime Security 4 (2005) ("Vessels can be used to transport powerful conventional explosives or [weapons of mass destruction] for detonation in a port. . . ."); John F. Frittelli, Cong. Research Serv., Port and Maritime Security: Background and Issues for Congress 1 (2005) ("[S]ecurity experts are worried that the maritime transportation system could be used by terrorists to smuggle personnel, weapons of mass destruction, or other dangerous materials into the United States."); Gen. Accounting Office, Homeland Security: Process for Reporting Lessons Learned from Seaport Exercises Needs Further Attention 1 (2005) ("Seaports are vulnerable entry points for bombs or other devices smuggled into cargo ships. . . ."); JayEtta Z. Hecker, Gen. Accounting Office, Port Security: Nation Faces Formidable Challenges in Making New Initiatives Successful 3 (2002) ("Drugs and illegal aliens are routinely smuggled into this country, not only in small boats but also hidden among otherwise legitimate cargoes on large commercial ships.  These same pathways are available for exploitation by a terrorist organization or any nation or person wishing to attack [the United States] surreptitiously.").  That threat is the reason why "the

Fourth Amendment balance between the interests of the Government and the privacy right of the individual is . . . struck much more favorably to the Government at the border." Montoya de Hernández, 473 U.S. at 540, 105 S.Ct at 3310; see also Carroll, 267 U.S. at 154, 45 S.Ct. at 285; Flores-Montano, 541 U.S. at 152, 124 S.Ct. at 1585.

The concern that contraband or worse will be smuggled into this country has special force in modern times. At the dawn of the atomic age, Churchill warned that "[t]he Dark Ages may return—the Stone Age may return on the gleaming wings of science; and what might now shower immeasurable material blessings upon mankind may even bring about its total destruction."[7] The gleaming wings of science have brought us readily transportable chemical and biological weapons, and there are reports of suitcase-size nuclear bombs, all of which could be used by terrorists to commit murder on an unimaginable scale and to inflict devastating economic injury. See, e.g., Patrick Barriot, Nuclear and Radiological Weapons, in Treating Victims of Weapons of Mass Destruction: Medical, Legal, and Strategic Aspects 188 (Patrick Barriot & Chantal Bismuth eds., 2008) (noting that U.S.

_____

[7]Winston Churchill, The Sinews of Peace, Address at Westminster College (Mar. 5, 1946), reprinted in William Safire, Lend Me Your Ears: Great Speeches in History 871 (2d ed. 1997).

officials fear that terrorists could transport a suitcase bomb into one of the nation's ports via a maritime route); Gen. Accounting Office, Maritime Security: Better Planning Needed to Help Ensure an Effective Port Security Assessment Program 4 (2004) ("Ports present attractive targets for terrorists: they are sprawling, easily accessible by water and land, close to crowded metropolitan areas, and interwoven with complex transportation networks."); Hecker, Port Security, at 4 ("A terrorist act involving chemical, biological, radiological, or nuclear weapons at one of [the nation's] seaports could result in extensive loss of lives, property, and business; affect the operations of harbors and the transportation infrastructure (bridges, railroads, and highways) within the port limits; cause extensive environmental damage; and disrupt the free flow of trade."); Jonathan Medalia, Cong. Research Serv., Terrorist Nuclear Attacks on Seaports: Threat and Response 1 (2005) ("A terrorist Hiroshima-sized nuclear bomb (15 kilotons, the equivalent of 15,000 tons of TNT) detonated in a port would destroy buildings out to a mile or two; start fires . . . ; spread fallout over many square miles; disrupt commerce; and kill many people."); Nat'l Comm'n on Terrorist Attacks upon the U.S., The 9/11 Commission Report 391 (2004) ("Opportunities to do harm are as great, or greater, in maritime or surface transportation" as in commercial aviation). Given the dangers we face, the paramount national interest in conducting border searches to

20

protect this nation and its people makes it unreasonable to require any level of suspicion to search any part of a foreign cargo vessel coming into this country. Crew members' cabins are no exception because, like any other part of a vessel, they can be used to smuggle in weapons of mass destruction, illegal devices, or other contraband.

Of course, this is an "other contraband" case. The Agricultural Enforcement Team that searched Alfaro-Moncada's cabin was looking for agricultural contraband and found child pornography. Even limiting our analysis to the search for agricultural contraband, however, important national interests are still involved. See Montoya de Hernández, 473 U.S. at 544, 105 S.Ct. at 3312 ("At the border, customs officials have more than merely an investigative law enforcement role. They are also charged, along with immigration officials, with protecting this Nation from entrants who may bring anything harmful into this country, whether that be communicable diseases, narcotics, or explosives." (emphasis added)). Agricultural products can carry pests and diseases that "can harm the economy, the environment, plant and animal health, and public health." Gen. Accounting Office, Homeland Security: Management and Coordination Problems Increase the Vulnerability of U.S. Agriculture to Foreign Pests and Disease 1 (2006); see also Peyton Ferrier, U.S. Dep't of Agric., The Economics of Agricultural and Wildlife

21

Smuggling iv (2009) ("Banned agricultural goods can carry diseases, pathogens, foreign organisms, or contaminants that threaten the health of humans, animals, and plants; the environment; and the trade status of U.S. exports."); Gen. Accounting Office, Homeland Security: Management and Coordination Problems, at 37 ("The global marketplace and increased imports of agricultural products and international travelers into the United States have increased the number of pathways for the movement and introduction of foreign, invasive agricultural pests and diseases, such as avian influenza and foot-and-mouth disease."); Gen. Accounting Office, Homeland Security: Much is Being Done to Protect Agriculture from a Terrorist Attack, but Important Challenges Remain 7 (2005) ("Agricultural inspections at ports of entry [are] the first line of defense against the entry of foreign pests and diseases" into the United States). The fact that agricultural inspections are now performed by the Department of Homeland Security underscores the fact that halting the entry of agricultural contraband into this country is a component of national security.

Stopping agricultural pests and diseases from entering this country is an essential function of homeland security; when they have come across our borders, extensive damage has resulted. See Daniel Bertoni, Gen. Accounting Office, Invasive Forest Pets: Recent Infestations and Continued Vulnerabilities at Ports of

Entry Place U.S. Forests at Risk 11 (2006) (The infestations of the Asian longhorned beetle, emerald ash borer, and P.ramorum in the United States "began when the pests passed through U.S. ports of entry, hitchhiking in vehicles, cargo, or travelers' personal belongings. That pests have become established indicates that the first line of defense at the border has been breeched over the years."); id. at 6 (Efforts to eradicate the Asian longhorned beetle in New Jersey, New York, and Illinois have resulted in the removal of 8,000 infested trees); id. (Cost of removing and replacing trees infested by emerald ash borer estimated to reach $7 billion over 25-year period); id. at 6–7 (P.ramorum "has killed tens of thousands of trees and led to the destruction of over 1 million nursery plants."); Homeland Security: Much is Being Done to Protect Agriculture from a Terrorist Attack, at 47 (From 1995 to 2005, Florida lost 2.1 million citrus trees because of the spread of citrus canker, a highly contagious bacterial disease); Lawrence J. Dyckman, Gen. Accounting Office, Bioterrorism: A Threat to Agriculture and the Food Supply 4 (2003) ("[T]he United Kingdom has estimated that its outbreak of foot-and-mouth disease resulted in over $10 billion (U.S.) in losses to tourism and the food and agriculture sectors and the slaughter of over 4 million animals. Estimates of direct costs for a similar outbreak in the United States run has high as $24 billion with the destruction of about 13 million animals."); id. at 6 ("Foot-and-mouth disease

23

can be carried on the shoes of international passengers and the packages they carry, in international mail, and in garbage from international carriers.").

Not only is the national interest in searching for agricultural contraband coming into this country strong, but any expectation of privacy a crew member has in his living quarters is weaker when those quarters are brought to the border of this country. Montoya de Hernández, 473 U.S. at 539, 105 S.Ct. at 3309–10; see also United States v. Hidalgo-Gato, 703 F.2d 1267 (11th Cir. 1983) ("On crossing a border the individual is on notice that a search may be made, and his privacy is arguably less invaded by such search." (quotation and other marks omitted)). There are no inspection-free zones on a foreign cargo vessel at the border, just as there are none in an airplane or a motor vehicle. Someone who travels to the border in a recreational vehicle that also serves as his home could not reasonably expect that it would not be subject to search. The same is true of a crewman whose cabin, along with the rest of his ship, travels three miles up the Miami River to dock.

For all of these reasons, we conclude that the suspicionless search of Alfaro-Moncada's cabin on the MV RIO MIAMI, a foreign cargo ship, while it was docked at the Antillean Marine on the Miami River, was not a violation of the Fourth Amendment.

B.

Alfaro-Moncada attacks his conviction and sentence on other grounds. He contends that there was insufficient evidence to support his conviction. Specifically, Alfaro-Moncada argues that the government failed to prove the knowledge element of 18 U.S.C. § 2252(a)(4)(B)—that he "knowingly" possessed child pornography. He asserts that the evidence showed that he bought the DVDs by accident and kept them because of forces beyond his control, namely his forgetful memory and churning stomach.

Section 2252(a)(4)(B) criminalizes the knowing possession of child pornography. That section provides:

> Any person who . . . knowingly possesses, or knowingly accesses with intent to view, 1 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that . . . has been shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, if . . . the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and . . . such visual depiction is of such conduct . . . shall be punished as provided in [§ 2252(b)(2)].

18 U.S.C. § 2252(a)(4)(B). To satisfy the knowledge element of § 2552(a)(4)(B), the government had to prove that Alfaro-Moncada knew the DVDs in his possession showed minors engaging in sexually explicit conduct. See United

25

States v. X-Citement Video, Inc., 513 U.S. 64, 78, 115 S.Ct. 464, 472 (1994) (concluding that "the term 'knowingly' in § 2252 extends both to the sexually explicit nature of the material and to the age of the performers"); United States v. Lacy, 119 F.3d 742, 747 (9th Cir. 1997) ("Possession of [DVDs] is ordinarily lawful. The presence of illegal images on the [DVDs] is a crucial element separating legal innocence from wrongful conduct. Accordingly, a defendant may be convicted under § 2252(a)(4)(B) only upon a showing that he knew the matter in question contained an unlawful visual depiction." (quotation marks and citations omitted)); see also United States v Woodruff, 296 F.3d 1041, 1047 (11th Cir. 2002) ("We have long held that the term 'knowingly' means that the act was performed voluntarily and intentionally, and not because of a mistake or accident.").

Alfaro-Moncada's sufficiency challenge is free of anything resembling merit. The government introduced into evidence the covers of the DVD cases found in his desk drawers by Specialist Meyer and Officer Quiñones. On both of those covers there were photos of young girls engaging in sex acts. Although Alfaro-Moncada testified that he had bought the DVDs without knowing that they contained child pornography, the jury was free to reject that testimony and believe the opposite to be true. See United States v. Williams, 390 F.3d 1319, 1326 (11th

26

Cir. 2004) ("Where some corroborative evidence of guilt exists for the charged offense . . . and the defendant takes the stand in h[is] own defense, the [d]efendant's testimony, denying guilt, may establish, by itself, elements of the offense. This rule applies with special force where the elements to be proved for a conviction include highly subjective elements [such as] the defendant's intent or knowledge." (quotation marks and citations omitted)). Moreover, Alfaro-Moncada admitted in his testimony that he had looked at the covers of the DVD cases when he got back to the RIO MIAMI and watched a "little bit" of the DVDs inside. At that point, by his own admission, he knew that he was in possession of child pornography. His own testimony therefore established the knowledge element of § 2252(a)(4)(B).

Alfaro-Moncada did testify that he intended to throw the DVDs overboard after he discovered that they contained child pornography, but the jury was free not to believe him. See id. Even taking his testimony as true, once he discovered the DVDs contained child pornography and made the decision to put them in his desk drawer, he was in knowing possession of them. Although Alfaro-Moncada seems to think otherwise, the grace period for disposing of child pornography after discovering it is not an extended one. There was plenty of evidence to support the conviction.

27

## C.

Alfaro-Moncada also contends that the district court erred in allowing the government to show five still images of child pornography to the jury. Since he had stipulated that the DVDs contained child pornography, he argues that showing the images to the jury was done only to prejudice and inflame the minds of the jurors and was improper under Federal Rule of Evidence 403. Rule 403 permits a district court to exclude relevant evidence when the probative value of it is substantially outweighed by its unfairly prejudicial nature. See Fed. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."). But Rule 403, we have cautioned, "is an extraordinary remedy which the district court should invoke sparingly, and the balance should be struck in favor of admissibility." United States v. Dodds, 347 F.3d 893, 897 (11th Cir. 2003) (quotation and other marks omitted). We have also said that "in reviewing issues under Rule 403, we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." Id. (quotation and other marks omitted).

28

Admission of the five still images from the DVDs served valid purposes. See Old Chief v. United States, 519 U.S. 172, 190, 117 S.Ct. 644, 655 (1997). Those images proved that the DVDs actually contained child pornography, although it is true that Alfaro-Moncada stipulated to that fact. See id. at 186–87; 117 S.Ct. at 653 ("[The] standard rule [is] that the prosecution is entitled to prove its case by evidence of its own choice, or, more exactly, that a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it."). They also tended to show that Alfaro-Moncada knew he was in possession of child pornography, a fact that he did not stipulate. Even if showing the images to the jury created some risk of injecting emotions into the jury's decision-making, see id. at 180, 117 S.Ct. at 650, it was not an abuse of discretion for the district court to decide that the risk did not substantially outweigh the still images' probative value. That is especially true since the jury was only shown a small number of the images on the DVDs—only 5 out of 4,650. See Dodds, 347 F.3d at 899 (finding no abuse of discretion where images had multiple probative purposes, the district court took precautions to prevent unfair prejudice, and only 66 of 3,400 images were shown to the jury).

29

D.

Alfaro-Moncada also challenges the reasonableness of his 87-month sentence. "We review sentencing decisions only for abuse of discretion, and we use a two-step process." United States v. Shaw, 560 F.3d 1230, 1237 (11th Cir. 2009). First, we must "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence-including an explanation for any deviation from the Guidelines range." Id. (quoting Gall v. United States, 552 U.S. 38, 51, 128 S.Ct. 586, 597 (2007)). If we conclude that the sentence is procedurally sound, the second step is to review the "substantive reasonableness" of the sentence, taking into account the totality of the circumstances, "including the extent of any variance from the Guidelines range." Gall, 552 U.S. at 51, 128 S.Ct. at 597. If the district court's sentence is within the guidelines range, we expect that the sentence is reasonable. See United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005) ("After Booker, our ordinary expectation [of reasonableness] still has to be measured against the record, and the party who challenges the sentence bears the burden of establishing that the sentence is unreasonable in the light of

30

both that record and the factors in section 3553(a)."); see also United States v. Hunt, 526 F.3d 739, 746 (11th Cir. 2008) ("Although we do not automatically presume a sentence within the guidelines range is reasonable, we 'ordinarily . . . expect a sentence within the Guidelines range to be reasonable." (quoting Talley, 431 F.3d at 788)).

When deciding upon a sentence, the district court must evaluate all of the § 3553(a) factors. Gall, 552 U.S. at 49–50, 128 S.Ct. at 596; Shaw, 560 F.3d at 1237. In assessing the factors, the district court is "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Gall, 552 U.S. at 52, 128 S.Ct. at 598 (quotation marks omitted). "[A] district court has 'considerable discretion' in deciding whether the § 3553(a) factors justify a variance and the extent of one that is appropriate." Shaw, 560 F.3d at 1238 (quoting United States v. Pugh, 515 F.3d 1179, 1191 (11th Cir. 2008)). We give that decision "due deference" because district courts have an "institutional advantage" in making sentencing determinations. Id. We may vacate a sentence only "'if we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the

31

facts of the case.'" Id. (quoting Pugh, 515 F.3d at 1191). "[T]hat we 'might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal.'" Id. (quoting Gall, 552 U.S. at 51, 128 S.Ct. at 597)).

As for procedural error, Alfaro-Moncada does not contend that the district court incorrectly calculated the sentencing guidelines or treated them as mandatory. Instead, he argues that the district court failed to adequately consider the § 3553(a) factors. We disagree. Before imposing its sentence, the district court stated that it had "considered the statements of the parties, the presentence report containing the advisory guidelines and the statutory factors." The court's acknowledgment that it had considered Alfaro-Moncada's arguments and the § 3553(a) factors "alone is sufficient in post-Booker sentences." United States v. Scott, 426 F.3d 1324, 1330 (11th Cir. 2005).

Because we find that his sentence is "procedurally sound," Shaw, 560 F.3d at 1237, we next must determine whether Alfaro-Moncada's sentence is substantively reasonable. He contends that his 87-month sentence—a sentence at the lowest end of his advisory guideline range—is "greater than necessary," see 18 U.S.C. § 3553(a), to achieve the purposes of sentencing. He argues that the district court failed to place sufficient weight on the nature and circumstances of the offense and his personal characteristics and history. It is his position that a

32

sentence below the advisory guidelines range would have adequately reflected the seriousness of his offense and provided just punishment.

An 87-month, within the guidelines, sentence in this case is not outside the range of reasonableness. See Shaw, 560 F.3d at 1238. The district court explained that it was imposing that sentence because of the harm caused by child pornography, the strong interest in deterring its consumption, and Alfaro-Moncada's failure to recognize the wrongfulness of his conduct. Those were all valid considerations under § 3553(a). See 18 U.S.C. § 3553(a)(2)(A) (seriousness of the offense); § 3553(a)(2)(B) (afford adequate deterrence); § 3553(a)(2)(C) (protect the public from further crimes of the defendant). The court's decision to sentence Alfaro-Moncada to a term of imprisonment at the lowest end of his advisory guidelines range was lenient enough. The sentencing decision was not an abuse of discretion.

IV.

Alfaro-Moncada's conviction and sentence are AFFIRMED.