[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 13-10602, 13-10606, 13-10717, 13-10719
_____

D.C. Docket Nos. 0:11-cr-60273-WPD-2, 0:11-cr-60273-WPD-3,
0:11-cr-60273-WPD-6, 0:11-cr-60273-WPD-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DAVID CLUM, JR.,
CHRISTOPHER MARRERO,
DALE PETERS,
MICHAEL D. BEITER, JR.,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(April 13, 2015)

Before MARTIN and FAY, Circuit Judges, and GOLDBERG,[*] Judge.

PER CURIAM:

David Clum, Jr., Christopher Marrero, Dale Peters, and Michael D. Beiter, Jr., appeal their convictions and sentences for their involvement in an extensive tax-fraud conspiracy with a number of defendants. We affirm.

## I. BACKGROUND

Peters and Clum met at a tax-protestor seminar on the use of IRS Form 1099-OID to obtain refunds from the government. Some tax protesters believe that the government maintains secret trust accounts for citizens, which can be accessed through filing tax forms such as Form 1099-OID. That tax form is an income-reporting document, similar to a W-2, which is normally used for debt instruments that are sold at an "original issue discount." Because the instrument is purchased for less than it will be worth at maturity, the amount of OID is considered taxable income. In contrast, tax protestors use Form 1099-OID to receive large refunds by treating all of a taxpayer's expenses and personal debt obligations as "interest income" ("OID Theory"). Because the form also indicates that taxes were withheld on the "income" amounts, a refund is due to the taxpayer. After the seminar, Peters and Clum discussed potential business opportunities using the OID Theory.

---

[*] The Honorable Richard W. Goldberg, United States Court of International Trade Judge, sitting by designation.

In early December 2008, Clum appeared on a radio show hosted by Beiter to discuss the OID Theory.  The following week, Clum appeared on another episode of the same radio show and invited listeners to call in.  Clum and Beiter became acquainted with codefendant Penny Jones, when she called the radio show, introduced herself as a tax professional, and expressed interest in the OID Theory. That same month, Beiter, Clum, Peters, and Jones incorporated PMDD Services ("PMDD"). Through this company, the defendants perpetuated a tax-fraud scheme by creating and sometimes filing fraudulent 1099-OID forms with the Internal Revenue Service ("IRS") on behalf of recruited clients.  The forms reported fabricated income and tax withholding and allowed the defendants to claim false tax refunds.

To recruit clients for their scheme, the defendants hosted two seminars: one in December 2008, where they met codefendant Marrero, and a second in January 2009.  About twenty people attended each seminar to learn about the OID Theory and the services PMDD offered.  The invitees were promised large payments using 1099-OID forms and were assured the process was legal.

The defendants successfully recruited a number of clients through the seminars.  Through PMDD's 1099-OID process, the clients were told the IRS would refund their expenses from the previous three years, including any mortgage

3

or automobile-loan payments.  The clients again were assured incorrectly the process was legal.

Before filing forms on behalf of the recruited clients, Clum volunteered as a test subject and submitted frivolous 1099-OID forms in his name.  After the test run and throughout the scheme, Clum, Beiter, and Peters revised their procedures to streamline their scam.

Each defendant also participated in other ways.  Clum and Beiter recruited clients.  Beiter also managed PMDD's bank accounts.  Peters developed the company's computer software, designed e-mails sent to clients, and created the company's client worksheet through which they collected client information.  He also signed documents as an authorized agent of PMDD, provided technical assistance to clients, assigned client identification numbers, and processed client information needed by Jones to produce the tax forms.  Marrero, though not a partner in PMDD, recruited clients through a referral agreement.

The procedures developed by Clum, Beiter, and Peters required each client to sign a nonsolicitation agreement, a nondisclosure agreement, a power of attorney authorizing PMDD to speak to the IRS on the client's behalf, and a services agreement, promising to pay PMDD's $750 preparation fee, plus a ten-percent commission of any tax refund the client recovered.  The defendants also required each client to complete a fourteen-page information worksheet, listing

4

mortgages, loans, lines of credit, and credit cards. After collecting client information, Jones, an enrolled tax preparer with the IRS, electronically filed some of the false 1099-OID forms. Because of the large number of forms the IRS processes each year, some of the false 1099-OID forms went unnoticed and refunds were paid.

At various points throughout the scheme, each defendant either was contacted directly by the IRS or was forwarded letters by clients, whom the IRS had contacted. Despite warning letters regarding the falsity of their 1099-OID filings, the defendants were undeterred. They continued perpetuating the scheme and prevented clients from defecting by assuring them the IRS letters were empty threats to keep citizens from seeking their legal refunds. They also instructed clients how to avoid the IRS's collection efforts of the paid refunds.

The forms Jones submitted on behalf of over 400 clients requested $166,676,471 in tax refunds. Twenty-four of the submitted forms resulted in payments totaling $7,151,182. When a client received a refund, PMDD collected a ten-percent commission. If the refund was for a client that Marrero recruited, PMDD paid him a small portion of the ten-percent commission fee. Marrero also collected $250 from each of his recruited clients directly.

The IRS began investigating PMDD in 2009. Because PMDD was under scrutiny, the defendants incorporated a successor company, Forever Grace, to

continue the scheme.  Despite the name change, Forever Grace's operations and the defendants' roles within Forever Grace were the same as with PMDD.  The defendants also changed their e-mail addresses to remove any reference to OID because they thought it would draw attention.  Instead, the defendants used email addresses that referenced PMDD to give clients comfort that Forever Grace was still the same operation.

Clum, Beiter, and Peters profited approximately $89,600, $97,400, and $38,600, respectively.  Through his recruiting arrangement with PMDD, Marrero profited approximately $17,191 from the scheme.  Marrero also profited by submitting fraudulent tax forms in his name.  In May 2010, Marrero prepared tax forms for 2007, 2008, and 2009 and reported fabricated gambling winnings.  He mailed the three forms to three different IRS service centers in Missouri, Texas, and California.  From these three forms, Marrero requested a tax refund totaling $279,635.  Marrero received a fraudulent refund of $90,369, which he quickly removed from his bank account through a series of large cash withdrawals.

On May 17, 2012, Clum, Beiter, Peters, and Marrero were charged in a superseding indictment with conspiracy to defraud the United States by obtaining and aiding the payment and allowance of false, fictitious, and fraudulent claims, in violation of 18 U.S.C. § 286 (Count One).  They also faced multiple individual charges for making false, fictitious or fraudulent claims to an agency of the United

States, in violation of 18 U.S.C. § 287 (Counts Two–Forty-Two).[1]  Clum, Beiter,

Peters, and Marrero were tried by a jury; each was convicted and sentenced to

imprisonment.[2]  They raise various trial and sentencing issues on appeal.

## II.  DISCUSSION

A. Trial Issues[3]

---

[1] The indictment also charged Jones and one other coconspirator, both of whom pled guilty prior to trial and are not parties in this appeal.

[2] Beiter was sentenced to 120 months of imprisonment for Count One, three consecutive 60-month imprisonment terms for Counts Two, Three, and Four, and a concurrent 60-month imprisonment term for Counts Five through Forty-Two.  Clum was sentenced to 120 months of imprisonment for Count One, three consecutive 60-month imprisonment terms for Counts Two, Three, and Four, a consecutive 53-month imprisonment term for Count Five, and a concurrent 60-month imprisonment term for Counts Six through Forty-Two.  Peters was sentenced to 120 months of imprisonment for Count One and an imprisonment term of 24 months for each of Counts Two through Thirty, Thirty-Two, and Forty-Two, to be served concurrently but consecutive to the sentence for Count One.  Marrero was sentenced to 120 months of imprisonment for Count One and an imprisonment term of 60 months for each of Counts Five, Fourteen, Eighteen, Forty-Three, Forty-Four, and Forty-Five, to be served concurrently but consecutive to the sentence for Count One.

[3] We address only the trial issues that warrant discussion.  The following arguments raised by defendants regarding trial issues are unavailing and do not merit further commentary because: (1) PMDD and Forever Grace were part of the same conspiracy; (2) the decision of whether to grant a severance lies within the district judge's "sound and substantial discretion," *United States v. Lopez*, 649 F.3d 1222, 1235–36 (11th Cir. 2011); (3) Agent Lavoro's grand-jury testimony did not necessitate dismissal of the indictment because, even if Lavoro's testimony was incorrect, the defendants have failed to show "unfair or actual prejudice," *United States v. Garate-Vergara*, 942 F.2d 1543, 1550 (11th Cir. 1991) ("Conviction beyond a reasonable doubt without the use of the tainted testimony or alleged misconduct at trial makes it highly improbable that the grand jury indictment was based on insufficient probable cause."); (4) the voluminous discovery provided to defendants did not violate their due process rights, *United States v. Jordan*, 316 F.3d 1215, 1253 (11th Cir. 2003); (5) the district judge did not abuse his discretion by denying Clum's motion for a bill of particulars, *United States v. Colson*, 662 F.2d 1389, 1391 (11th Cir. 1981); and (6) the district judge did not abuse his discretion by admitting evidence of Peters's attempts to avoid detection and prosecution.  "Rule 403 requires a court to 'look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact.'"  *Lopez*, 649 F.3d at 1247 (quoting *United States v. Alfaro–Moncada*, 607 F.3d 720, 734 (11th Cir. 2010)).  [T]he balance to be struck is largely committed to the discretion

7

1. *Sufficiency of the Evidence*

At the close of the government's case and at the close of all evidence, the defendants moved for judgments of acquittal.  The district judge denied the motions.  On appeal, Clum, Peters, and Marrero argue the district judge should have granted their motions, because the evidence was insufficient to show they intended to violate the law.

"We review *de novo* the legal question of whether the record contains sufficient evidence to support the guilty verdict."  *United States v. Tinoco*, 304 F.3d 1088, 1122 (11th Cir. 2002) (citing *United States v. To*, 144 F.3d 737, 743 (11th Cir. 1998)).  We assess the evidence in the light most favorable to the government and resolve "all reasonable inferences and credibility evaluations in favor of the jury's verdict."  *Id.*  We leave the defendants' convictions undisturbed "'unless no trier of fact could have found guilt beyond a reasonable doubt.'"  *Id.* (quoting *United States v. Calderon*, 127 F.3d 1314, 1324 (11th Cir. 1997)).  The defendants were convicted for violating 18 U.S.C. §§ 286 and 287.

> This court will sustain a conviction for conspiracy to submit false claims to the United States [in violation of § 286], if the government proved "the existence of an agreement to achieve an unlawful objective, the defendant's knowing and voluntary participation in the conspiracy, and the commission of an overt act in furtherance of it."

of the district court, which has far more experience in evidentiary matters and is better equipped to decide them than an appellate court." *Id.*

*United States v. Gupta*, 463 F.3d 1182, 1194 (11th Cir. 2006) (footnote omitted) (quoting *United States v. Suba*, 132 F.3d 662, 672 (11th Cir. 1998)).

"Conspiracy may be proven by circumstantial evidence and the extent of participation in the conspiracy or extent of knowledge of details in the conspiracy does not matter 'if the proof shows the defendant knew the essential objective of the conspiracy.'" *Id.* (quoting *Suba*, 132 F.3d at 672). We sustain a conviction for making false claims in violation of § 287, if the government proved the defendant knowingly made or presented a false, fictitious, or fraudulent claim to a department of the United States with the specific intent to violate the law or with a consciousness that what he was doing was wrong. *United States v. Slocum*, 708 F.2d 587, 596 (11th Cir. 1983).

The defendants challenge only the sufficiency of the evidence regarding intent, because they maintain they held a sincere belief in the OID Theory. Although a defendant's good-faith belief in a tax theory lacks the requisite criminal intent, whether the defendants held such a belief is a question for the factfinder. *See Cheek v. United States*, 498 U.S. 192, 201–03, 111 S. Ct. 604, 610–11 (1991). "In rebutting the government's evidence '[i]t is not enough for a defendant to put forth a reasonable hypothesis of innocence, because the issue is not whether a jury reasonably could have acquitted but whether it reasonably could have found guilt beyond a reasonable doubt.'" *United States v. Jiminez*, 564 F.3d 1280, 1285 (11th

9

Cir. 2009) (alteration in original) (quoting *United States v. Thompson*, 473 F.3d 1137, 1142 (11th Cir. 2006)). The jury in this case reasonably could have found the requisite intent.

The defendants rely primarily on their own testimony at trial to support their argument on appeal. Clum, Peters, and Marrero all testified at trial they did not intend to violate the law. "[W]hen a defendant chooses to testify, he runs the risk that if disbelieved 'the jury might conclude the opposite of his testimony is true.'" *United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995) (quoting *Atkins v. Singletary*, 965 F.2d 952, 961 n.7 (11th Cir. 1992)). A jury may use disbelieved testimony as substantive evidence of guilt. *Id.* Although the defendants, and other witnesses who believed the defendants' sincerity, testified consistently with their hypotheses of innocence, the jury seeing their demeanor and making credibility determinations was entitled to disbelieve them. *See id.* "[W]e assume that the jury made all credibility choices in support of the verdict." *Jiminez*, 564 F.3d at 1285 (citing *Thompson*, 473 F.3d at 1142). The jury's credibility determinations in combination with the other evidence of the scheme, including e-mails, clearly false tax forms, and the defendants' profit, presented sufficient evidence to enable the jury to find the defendants guilty.

## 2. *First Amendment and Tax-Fraud Activities*

Beiter challenges his conviction as violating his First Amendment rights.[4]

He recognizes the judge instructed the jury on the First Amendment, but he

contends he merely counseled tax payers without inciting a violation of tax laws.

We review questions of constitutional law de novo. *Loyd v. Ala. Dep't of Corr.*,

176 F.3d 1336, 1339 (11th Cir. 1999).

Generally, "'the First Amendment means that government has no power to

restrict expression because of its message, its ideas, its subject matter, or its

content.'" *United States v. Stevens*, 559 U.S. 460, 468, 130 S. Ct. 1577, 1584

(2010) (quoting *Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 573, 122 S.

Ct. 1700, 1707 (2002)). Certain types of speech, however, may be restricted and

punished without raising a Constitutional problem. *Id.* at 469, 130 S. Ct. at 1585.

One such type of speech is speech that is integral to criminal conduct.[5] *Giboney v.*

*Empire Storage & Ice Co.*, 336 U.S. 490, 498, 69 S. Ct. 684, 688–89 (1949).

---

[4] Clum, Peters, and Marrero adopted Beiter's argument challenging their convictions for violating their First Amendment rights.

[5] Beiter relies on *United States v. Dahlstrom*, 713 F.2d 1423 (9th Cir. 1983). *Dahlstrom* addresses a different exception to First Amendment protection—speech that incites imminent lawless action. Because the defendants were charged with conspiracy committed in part by speech, the proper analysis is to determine whether that speech was integral to the conspiracy. *See United States v. Meredith*, 685 F.3d 814, 820 (9th Cir. 2012). Even under the *Dahlstrom* analysis, Beiter's argument fails. The seminars held by the defendants did far more than advocate the possibility of filing fraudulent forms. Instead, the defendants actively were recruiting and signing clients to participate imminently in their scheme.

11

Speech that could have First Amendment protection is not protected speech, if it is part of "a single and integrated course of conduct," which violates the law. *Id.*

The evidence in this case shows the defendants' words and acts were not abstract discussions removed from the conspiracy to defraud the United States. Instead, the defendants' seminars were tools to facilitate their illegal tax scheme by enticing clients, whom they then instructed and advised to claim fraudulent refunds for taxes the clients never paid. The evidence shows the clients followed the defendants' instructions and submitted fraudulent tax forms through the defendants' company. Beiter's claim of First Amendment protection is frivolous. *See United States v. Kelley*, 769 F.2d 215, 217 (4th Cir. 1985) ("The claim of First Amendment protection of his speech is frivolous. His was no abstract criticism of income tax laws. His listeners were not urged to seek congressional action to exempt wages from income taxation. Instead, they were urged to file false returns, with every expectation that the advice would be heeded.").

Moreover, Beiter's argument ignores his role in the conspiracy. As explained in *Pinkerton v. United States*, 328 U.S. 640, 647–48, 66 S. Ct 1180, 1184 (1946), a conspirator is liable for the acts of his coconspirators if those acts are in furtherance of the conspiracy. There is substantial evidence to establish a conspiracy among the defendants. Therefore, although Jones was the only

12

defendant to file fraudulent forms, all of the defendants are liable for her conspiratorial acts.  *See id.*

    3. *Motions for Mistrial*

    Clum argues the district judge should have granted a mistrial, when (1) one of PMDD's clients characterized his conversations with Beiter as being antigovernment, and (2) one of the former defendants testified Beiter and Clum told her to flee the country to avoid prosecution.[6]  We find his arguments concerning the challenged testimony unavailing.  *See United States v. Veteto*, 701 F.2d 136, 140 (11th Cir. 1983) (finding a mistrial not warranted, where "prosecutor did not seek or expect the answer given"); *United States v. Hammond*, 781 F.2d 1536, 1540 (11th Cir. 1986) ("Courts may consider evidence of attempts to influence a witness as relevant in showing a consciousness of guilt.").

    Clum also assigns error to the government's closing, when the prosecutor argued:

> [W]hen you look at some of the other documents, such as this one that he was shown when he testified, he basically says, I'm not a U.S. citizen.  So when it suits his interest, when it helps him, he is willing to wrap himself in the flag in these patriot movements. Well, in reality, when he uses the term patriot it is anti-American and it is simply a way to cheat people.

ROA at 2054.

---

[6] Peters and Marrero adopted Clum's argument challenging the denial of the motions for mistrial.

13

"The decision of whether to grant a mistrial lies within the sound discretion of a trial judge as he or she is in the best position to evaluate the prejudicial effect of improper testimony." *United States v. Perez*, 30 F.3d 1407, 1410 (11th Cir. 1994) (citing *United States v. Holmes*, 767 F.2d 820, 823 (11th Cir. 1985)). "We will not reverse a district court's refusal to grant a mistrial unless an abuse of discretion has occurred." *Id.* (citing *United States v. Christopher*, 923 F.2d 1545, 1554 (11th Cir. 1991)). "[T]here is no prohibition on 'colorful and perhaps flamboyant' remarks if they relate to the evidence adduced at trial." *United States v. Bailey*, 123 F.3d 1381, 1400 (11th Cir. 1997) (quoting *United States v. Jacoby*, 955 F.2d 1527, 1541 (11th Cir. 1992)).

The judge found the prosecutor's remarks to be fair comments on the evidence that did not vitiate Clum's right to a fair trial. "We give considerable weight to the district court's assessment of the prejudicial effect of the prosecutor's remarks and conduct." *United States v. Herring*, 955 F.2d 703, 710 (11th Cir. 1992). We agree with the district judge. Testimony established a link between tax protesters referring to themselves as patriots and sovereigns and their beliefs they are not bound by laws other Americans follow. Since the evidence supported the prosecutor's statement, there was no error.

Clum also argues that the accumulation of errors during the trial mandates reversal of his convictions. We disagree. Clum has failed to show a single error,

14

much less the accumulation of many errors.  Therefore, his argument under the

cumulative-error doctrine fails.

B. <u>Sentencing Issues</u>[7]

Clum and Marrero challenge the two-offense-level points they received for

sophisticated means.  "A district court's finding that sophisticated means were

used is a finding of fact reviewed for clear error."  *United States v. Barrington*, 648

F.3d 1178, 1199 (11th Cir. 2011) (citing *United States v. Barakat*, 130 F.3d 1448,

1456–57 (11th Cir. 1997)).

The Guidelines provide for a two-level enhancement for offenses involving

"sophisticated means."  U.S.S.G. §§ 2B1.1(b)(10), 2T1.4(b)(2).  "'[S]ophisticated

means' means especially complex or especially intricate offense conduct pertaining

---

[7] We address only the issues that warrant discussion.  The following arguments raised by defendants regarding sentencing issues are unavailing and do not merit further commentary, because the judge (1) properly calculated the amount of tax loss, U.S.S.G. 2T1.1(c), and (2) did not err in not reducing Peters's sentence based on minor or minimal role, *see generally United States v. Rodriguez De Varon*, 175 F.3d 930 (11th Cir. 1999);  (3) the judge did not err in sentencing Clum as the leader/organizer of the conspiracy;  (4) the judge did not err in not reducing Clum's sentence based on acceptance of responsibility, *see United States v. Gonzalez*, 70 F.3d 1236, 1239 (11th Cir. 1995) (describing examples of rare situations in which a defendant goes to trial contesting factual guilt and still qualifies for a reduction based on acceptance of responsibility); (5) Clum's sentence was substantively reasonable and sufficiently explained by the judge; (6) the judge explained, and Marrero agreed, his base-offense level would have been the same if the judge had used § 2B1.1 or § 2T1.9 of the Sentencing Guidelines*, United States v. Keene*, 470 F.3d 1347, 1350 (11th Cir. 2006) ("[I]t would make no sense to set aside this reasonable sentence and send the case back to the district court since it has already told us that it would impose exactly the same sentence . . . ."); and (7) the judge imposed an upward variance—not an upward departure—when sentencing Marrero, *United States v. Kapordelis*, 569 F.3d 1291, 1316 (11th Cir. 2009) (holding the district court applied an upward variance, when it "did not cite to a specific guideline departure provision, and its rationale was based on the § 3553(a) factors and its finding that the Guidelines were inadequate").  We conclude the remaining issues are abandoned.  *United States v. Jernigan*, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003).

to the execution or concealment of an offense."  U.S.S.G. §§ 2B1.1(b)(10) cmt. n.9, 2T1.4(b)(2) cmt. n.3.  "Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates sophisticated means."  *Id.*  "There is no requirement that each of a defendant's individual actions be sophisticated in order to impose the enhancement.  Rather, it is sufficient if the totality of the scheme was sophisticated."  *United States v. Ghertler*, 605 F.3d 1256, 1267 (11th Cir. 2010) (discussing the sophisticated-means enhancement under U.S.S.G. § 2B1.1(b)(9)(C)).

The judge did not err in enhancing the defendants' sentences for sophisticated means.  The defendants took substantial steps to conceal their activities, their identities, and their proceeds from their scheme.  To conceal their central operating business, PMDD, they layered the corporation with a number of shell corporations.  Jones concealed PMDD's operations by filing the forms as an individual tax preparer, rather than as an agent of PMDD.  To conceal themselves, the defendants used aliases in their communications.  When the IRS began investigating PMDD, the defendants changed their e-mail addresses and created a new corporation to continue the scheme without detection.  When clients began receiving large refunds, the defendants counseled them on how to conceal the assets.  Specifically, the defendants told some clients to hide assets in trust

16

accounts, and other clients to transfer their refunds into cashier's checks, deposit the money into a casino account, and then remove the money from the casino account to create a false trail as to the origin of the money. The defendants hid their own proceeds from the scheme in bank accounts of their shell corporations.

The defendants "hid[] assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." U.S.S.G. §§ 2B1.1(b)(10) cmt. n.9, 2T1.4(b)(2) cmt. n.3. Because their actions fit the definition of sophisticated means under the Sentencing Guidelines, the district judge did not err in enhancing the defendants' sentences. Their convictions and sentences are **AFFIRMED.**